PALLAS PARTNERS (US) LLP
Duane L. Loft
Shireen Barday
Anastasia Cembrovska
Ashley Mullen
75 Rockefeller Plaza
New York, New York 10019
Tel: (212) 970-2300

*Attorneys for Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ENDO INTERNATIONAL PLC, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 22-22549 (JLG)<br><br>(Jointly Administered) |
| MATTHEW DUNDON, TRUSTEE OF THE ENDO GUC TRUST,<br><br>Plaintiff,<br><br>v.<br><br>TPG CAPITAL, L.P., TPG GLOBAL, LLC, TPG VI MANAGEMENT, LLC, TPG PARTNERS VI, L.P., TPG BIOTECHNOLOGY PARTNERS IV, L.P., TPG ADVISORS V, INC., TPG ADVISORS VI, INC., TPG BIOTECHNOLOGY GENPAR IV, L.P., TPG GENPAR VI, L.P., TPG SKY L.P., TPG SKY CO-INVEST L.P., TPG BIOTECHNOLOGY PARTNERS IV L.P., PARK STREET INVESTORS L.P., PAUL VICTOR CAMPANELLI, THOMAS JOSEPH HAUGHEY,  TERRANCE COUGHLIN, PATRICK LEPORE, BARRY J. GILMAN, JOSEPH A. BARBARITE, CHAD M. GASSERT, STEPHEN O. MONTALTO, | Adv. Pro. No. 24-_____ (JLG)<br><br>**<u>COMPLAINT</u>** |

ANTONIO PERA, MUTHUSAMY
SHANMUGAM, STEPHEN CAREY,
SUKETU P. SANGHVI, LAWRENCE
MILTON BROWN, PHILLIP JOHN
BRANCAZIO, DIANE MONTALTO,
SHARAD MANSUKANI, KEITH A.
KUCINSKI, MICHAEL J. ALTAMURO,
MARTIN L. WILSON, KAREN A.
O'CONNOR, JOHN L. AMERES, HYUN
SOO HONG, ANH TRANCAO, and JOHN
DOES 1-999,

　　　　　Defendants.

## TABLE CONTENTS

NATURE OF THE ACTION ............................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 4

THE PARTIES ................................................................................................................... 5

    A.    The Plaintiff and the Endo GUC Trust ................................................... 5

    B.    Endo PLC and its Affiliates ..................................................................... 5

    C.    Par and TPG ............................................................................................. 5

    D.    Individual Defendants .............................................................................. 8

    E.    Doe Defendants...................................................................................... 12

FACTUAL ALLEGATIONS ........................................................................................... 12

    A.    The Opioid Epidemic ............................................................................ 12

    B.    Par's Opioid Business ............................................................................ 15

    C.    TPG's Domination and Control of Par .................................................. 16

    D.    Par's and TPG's Continued Misconduct in the Sale of Generic Opioids. ........... 19

    E.    TPG's Awareness of Its Opioid-Related Liability................................. 20

    F.    TPG's Sale of Par to Endo .................................................................... 25

    G.    Endo's Insolvency At the Time of the Transactions............................... 27

    H.    Authority to Prosecute Causes of Action for the Benefit of the Endo Estates and Creditors................................................................................................. 29

CLAIMS FOR RELIEF ................................................................................................... 31

    COUNT I: Avoidance of the Par Sale Transfers as Constructive Fraudulent Transfers – UFTA or Other Applicable Law............................................................. 31

    COUNT II: Avoidance of the TPG Dividend Based on Intent to Hinder, Delay, or Defraud Creditors – UFTA or Other Applicable Law ...................................... 33

    COUNT III: Avoidance of the TPG Dividend as Constructive Fraudulent Transfers – UFTA or Other Applicable Law................................................................. 34

    COUNT IV: Reimbursement, Indemnification, and/or Contribution .............................. 35

RESERVATION OF RIGHTS ......................................................................................... 36

PRAYER FOR RELIEF................................................................................................... 36

Plaintiff Matthew Dundon, not in his personal capacity but solely in his capacity as the trustee (the "Trustee") for the Endo GUC Trust (the "GUC Trust" or the "Trust"), established pursuant to the Fourth Amended Joint Chapter 11 Plan of Reorganization of Endo International plc and its Affiliated Debtors [Dkt. No. 3849] (the "Plan") and the Endo GUC Trust Agreement, dated April 23, 2024, by and among (i) the Trustee, (ii) UMB Delaware Inc., as Delaware Trustee, (iii) Endo, Inc., and (iv) Endo International plc (the "Trust Agreement"), acting on behalf of itself and as successor-in-interest to the estates of the above-captioned debtors and debtors-in-possession (the above-captioned debtors and debtors-in-possession, collectively, the "Debtors") with respect to this litigation, respectfully alleges as follows:

## NATURE OF THE ACTION

1.      This is an action to hold private-equity giant TPG accountable for its role in the opioid epidemic, and for the corresponding injury that TPG inflicted on Debtors and their creditors. In 2012, TPG conducted a leverage buyout of Par Pharmaceuticals ("Par"), the now-infamous producer of generic opioid pain pills.  Under TPG's domination and control following the buyout, Par rushed to gain market share in generic opioids, as the nation's deadliest drug epidemic spun out of control.  Indeed, during the years it was owned by TPG, Par's market share in certain generic opioids increased from 15% to 25% of the market—from 1.7 billion to 3 billion pills a year.

2.      All the while, Par and TPG were warned by auditors that they were not meeting federal requirements for detecting suspicious orders of Par's generic opioids.  "There is no Suspicious Ordering Monitoring System in place," auditors wrote in May 2010, referring to a reporting mechanism required by the DEA.  Par and TPG ignored those warnings.  Indeed, over the entirety of TPG's ownership and control of Par, the company did not notify the DEA of a single suspicious order.

3.      As late as 2015, Par's outside auditors continued to raise concerns about Par's oversight of opioid sales.  "Par's current SOM [Suspicious Ordering Monitoring] system as it currently operates may be difficult to explain and defend during a DEA review," the auditor wrote. In the meantime, other generic opioid producers had come under increasing scrutiny.

4.      The consequences of flooding communities with opioids were devastating.  Opioids are highly addictive and can be fatal.  According to the Centers for Disease Control and Prevention ("CDC"), between 1999 and 2020, more than 564,000 Americans have died from overdoses involving opioids.  Countless more have become addicted or suffered other health problems as a direct result of opioid use.  Families have lost loved ones.  Children exposed in utero have been born with neonatal abstinence syndrome ("NAS").  Communities have been ravaged.  Americans became addicted to their prescribed drugs and then were forced to turn to pill mills and street drugs to feed those addictions.

5.      Predictably, this triggered a backlash by regulators, governmental entities, and individual victims of the opioid epidemic.  Drugmaker Purdue Pharma and its owners, the Sackler family, for years bore the brunt of public criticism for inventing and deceptively marketing one of the most well-known opioid painkillers, OxyContin, in the 1990s.  But as the death rate accelerated, public scrutiny turned to the handful of generic-drug manufacturers, including Par, that were selling the bulk of opioid pills flooding the country.  By 2013, Mallinckrodt, another large generic opioid producer, was facing a "tidal wave of litigation" that rendered the company insolvent and ultimately drove it into bankruptcy.

6.      With the writing on the wall, TPG looked for an exit.  Ultimately, in May 2015, TPG was able to sell Par to Endo in a deal valued at approximately $8 billion (the "Par Sale"). Just prior to the transaction, TPG caused Par to pay out a $494 million dividend to TPG and its co-

investors.  Then, in connection with the Par Sale, TPG and various insiders received transfers (as later defined, the "Par Sale Transfers") from Endo totaling approximately $5.4 billion.  All told, TPG, its co-investors, and its limited partners lined their pockets with over $6 billion in cash.  Having invested roughly $838 million to acquire Par, TPG and its investors saw a return of over ***seven times their money*** with the sale of Par to an unsuspecting Endo.  TPG's profiteering came on the death and destruction reaped by Par's sales of generic opioids.

7.      This is an action (a) to avoid and recover those transfers and (b) to hold TPG liable, as an alter ego of Par, for indemnity, reimbursement, and/or contribution for its proportionate liability as a joint tortfeasor in connection with Endo's settlements of billions of dollars of opioid liability.

8.      At the time of the Par Sale Transfers, Endo itself was insolvent.  For many years, Endo had manufactured and sold one of the most potent branded opioids on the market under the name Opana.  Prior to the Par Sale, Endo marketed Opana aggressively, despite repeated warnings of the havoc caused by the drug.  Most notably, Endo touted Opana as abuse deterrent and crush resistant—when it most certainly was not.  Ultimately, not long after the Par Sale, Endo was forced to take Opana off the market, dealing a crushing blow to the company's profitability.   In the meantime, Endo's own opioid liabilities continued to mount.  As later materialized, at the time of the Par Sale Transfers, Endo was sitting on substantial opioid liabilities.  These liabilities, which ultimately led Endo to file for Chapter 11, exceeded the asset value of the company at the time of the Par Sale Transfers, and rendered the company insolvent.

9.      In exchange for the over $5 billion in Par Sale Transfers, Endo did not receive anything close to reasonably equivalent value.  Instead, through the Par Sale, Endo simply inherited a mountain of further opioid liabilities.  Par continued its failure to report any meaningful

3

number of suspicious orders to the DEA, even though Par was flooding the country with opioids.
Far from delivering value to Endo and its stakeholders, let alone reasonably equivalent value, the
Par Sale simply sank Endo further into a morass of opioid exposure from which it would need
Chapter 11 to recover.

10.    Endo has now had to pay a disproportionate share of the liability to resolve billions
of dollars in claims brought by various governmental authorities and private claimants.  Every
dollar of liability incurred as a result of defendants' misconduct was ultimately borne by Debtors'
unsecured creditors, who were left with little at the end of Debtors' bankruptcy case.

## JURISDICTION AND VENUE

11.    The Court has subject-matter jurisdiction over this adversary proceeding under 28
U.S.C. §§ 157 and 1334 and the Standing Order of the United States District Court for the Southern
District of New York (the "Southern District of New York"), which refers to the Bankruptcy Judges
of the Southern District of New York all cases and proceedings arising under and related to title 11
of the United States Bankruptcy Code (the "Bankruptcy Code").  This adversary proceeding is
related to the chapter 11 bankruptcy case captioned *In re Endo International Plc, et al.*, Case No.
22-22549 (JLG), pending in this Court.

12.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (H).

13.    This Court has personal jurisdiction over each Defendant pursuant to Rule 7004(f)
of the Federal Rules of Bankruptcy Procedure, as, upon information and belief, all Defendants are
domiciled in the United States.

14.    This Court has general personal jurisdiction over each Defendant because
Defendants systematically and continuously transact business in this State.  The Court further has
specific personal jurisdiction over each Defendant based on acts and omissions that were directed
at Par, which at all relevant times had its principal place of business in New York.

15.     Venue in this judicial district is proper under 28 U.S.C. § 1409(a) because this adversary proceeding arises under the Bankruptcy Code or arises in or is related to the Bankruptcy Case.

## THE PARTIES

### A.    The Plaintiff and the Endo GUC Trust

16.     Plaintiff, Matthew Dundon, brings this action not in his personal capacity but solely in his capacity as the Trustee of the GUC Trust, a Delaware trust which was formed on April 11, 2024, pursuant to the Trust Agreement and Section 6.2 of the Plan.  On April 23, 2024, the Debtors and the holders of the Trust Transferred Assets transferred to the GUC Trust all claims against the GUC Excluded Parties (each as defined in the Plan), including those against Defendants.  The claims raised here are held by the GUC Trust in this capacity, as successor-in-interest to Endo, Par, and affiliated Debtors.

### B.    Endo PLC and its Affiliates

17.     During the time periods relevant to this complaint, Endo operated a specialty biopharmaceutical business that produced and sold both generic and branded products, including opioids.   Endo's most well-known branded opioid product was Opana, a highly potent opioid analgesic whose active ingredient was oxymorphone—a substance that is three times more potent than morphine.  Endo also sold substantial quantities of generic opioids.

### C.    Par and TPG

18.     Par Pharmaceutical Holdings, Inc. ("PPHI") is a Delaware corporation that was formed on July 12, 2012, under the name Sky Growth Holdings Corporation.  On March 4, 2015, in connection with the Par Sale, Sky Growth Holdings Corporation changed its name to Par Pharmaceutical Holdings, Inc.

19.     Par Pharmaceutical Companies, Inc. ("PPCI") was incorporated in Delaware with its principal place of business in Chestnut Ridge, New York.   PPCI was a wholly owned subsidiary of PPHI.

20.     Par Pharmaceutical, Inc. ("PPI") was incorporated in Delaware with its principal place of business in Chestnut Ridge, New York.   PPI is a wholly owned subsidiary of PPCI.   It was named as a defendant in litigation on account of its role in the distribution, marketing, and sale of generic opioid products, and contribution to the opioid crisis.  PPCI and PPI are collectively referred to here as "Par".

21.     TPG Capital, L.P. is a Delaware limited partnership with its principal place of business in Fort Worth, Texas.

22.     TPG Global, LLC is a Delaware limited liability company with its principal place of business in Fort Worth, Texas.

23.     TPG VI Management, LLC is a Delaware limited liability company with its principal place of business in Fort Worth, Texas.

24.     TPG Partners VI, L.P. is a Delaware limited partnership with its principal place of business in Fort Worth, Texas.

25.     TPG Biotechnology Partners IV, L.P. is a Delaware limited partnership with its principal place of business in Fort Worth, Texas.

26.     TPG Advisors V, Inc. is a Delaware corporation with its principal place of business in Fort Worth, Texas.

27.     TPG Advisors VI, Inc. is a Delaware corporation with its principal place of business in Fort Worth, Texas.

28.    TPG Biotechnology GenPar IV, L.P. is a Delaware limited partnership with its principal place of business in Fort Worth, Texas.

29.    TPG GenPar VI, L.P. is a Delaware limited partnership with its principal place of business in Fort Worth, Texas.

30.    TPG Sky L.P. is a Delaware limited partnership with its principal place of business in Fort Worth, Texas.  In connection with the Par Sale, TPG Sky L.P. received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $3,036,089,316. TPG Sky L.P. also received cash consideration from, or as a subsequent transferee of, Par in connection with the TPG Dividend, in an amount to be determined at trial.

31.    TPG Sky Co-Invest, L.P. is a Delaware limited partnership with its principal place of business in Fort Worth, Texas.  In connection with the Par Sale, TPG Sky Co-Invest, L.P. received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $37,345,044.  TPG Sky Co-Invest, L.P. also received cash consideration from, or as a subsequent transferee of, Par in connection with the TPG Dividend, in an amount to be determined at trial.

32.    TPG GenPar VI, L.P., TPG Biotechnology GenPar IV, L.P., TPG Advisors V, Inc., and TPG Advisors VI, Inc. (the "General Partnership Entities") were beneficially owned by TPG senior partners, certain of the John Doe Defendants, including TPG's David Bonderman and James Coulter.  The General Partnership Entities received a carried interest of 20% of the profits from any investment and were subsequent transferees of the Par Sale Transfers.

33.    Park Street Investors L.P. is incorporated in Delaware.  In connection with the Par Sale, Park Street Investors L.P. received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $9,958,735.  Park Street Investors L.P. also received

cash consideration from, or as a subsequent transferee of, Par in connection with the TPG Dividend, in an amount to be determined at trial.

### D. Individual Defendants

34. Defendant Paul Victor Campanelli served as Chief Executive Officer, President, and Director of Par at the time of the TPG Sale. Defendant Campanelli received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $41,825,036, in exchange for stock options and restricted stock units ("RSUs") held as of the date of the TPG Sale.

35. Defendant Thomas Joseph Haughey served as President and Officer of Par at the time of the TPG Sale. Defendant Haughey received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $20,606,840, in exchange for stock options and RSUs held as of the date of the TPG Sale.

36. Defendant Terrance Coughlin served as Chief Operating Officer of Par at the time of the TPG Sale. Defendant Coughlin received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $11,723,523, comprised of $4,979,390 for common stock and $6,744,133 for stock options and RSUs held as of the date of the TPG Sale.

37. Defendant Patrick LePore served as a Director of Par at the time of the TPG Sale. Defendant LePore received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $13,671,169, comprised of $9,958,723 for common stock and $3,712,445 for stock options and RSUs held as of the date of the TPG Sale.

38. Defendant Barry J. Gilman served as Senior Vice President and General Counsel of Par at the time of the TPG Sale. Defendant Gilman received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $5,039,811, in exchange for stock options and RSUs held as of the date of the TPG Sale.

39.    Defendant Joseph A. Barbarite served as Senior Vice President Global Quality and Compliance of PPCI, PPI, and, upon information and belief, PPHI, at the time of the TPG Sale. Defendant Barbarite received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $4,396,225, in exchange for stock options and RSUs held as of the date of the TPG Sale.

40.    Defendant Chad M. Gassert served as Senior Vice President of Business Development of Par at the time of the TPG Sale. Defendant Gassert received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $3,999,594, in exchange for stock options and RSUs held as of the date of the TPG Sale.

41.    Defendant Stephen O. Montalto served as Senior Vice President of Human Resources of Par at the time of the TPG Sale. Defendant Montalto received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $3,994,754, in exchange for stock options and RSUs held as of the date of the TPG Sale.

42.    Defendant Antonio R. Pera served as Chief Commercial Officer of Par at the time of the TPG Sale. Defendant Pera received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $4,228,290, comprised of $1,742,795 for common stock and $2,485,495 for stock options and RSUs held as of the date of the TPG Sale.

43.    Defendant Muthusamy Shanmugam served as Senior Vice President of Research and Development Operations India of Par at the time of the TPG Sale. Defendant Shanmugam received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $3,222,827, in exchange for stock options and RSUs held as of the date of the TPG Sale.

44.     Defendant Stephen Carey served as Senior Vice President, Corporate Controller, and Principal Accounting Officer at Par at the time of the TPG Sale. Defendant Carey received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $3,200,122, in exchange for stock options and RSUs held as of the date of the TPG Sale.

45.     Defendant Suketu P. Sanghvi served as Senior Vice President of Research and Development at Par at the time of the TPG Sale. Defendant Sanghvi received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $2,875,410, in exchange for stock options and RSUs held as of the date of the TPG Sale.

46.     Defendant Lawrence Milton Brown served as Vice President and Assistant General Counsel at Par at the time of the TPG Sale. Defendant Brown received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $2,858,064, in exchange for stock options and RSUs held as of the date of the TPG Sale.

47.     Defendant Phillip John Brancazio served as Senior Vice President of Commercial Operations at Par at the time of the TPG Sale. Defendant Brancazio received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $2,942,688, comprised of $248,980 for common stock and $2,693,708 for stock options and RSUs held as of the date of the TPG Sale.

48.     Defendant Diane Montalto served as Vice President of Information Technology and Corporate Services at Par at the time of the TPG Sale. Defendant Montalto received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $2,800,060, in exchange for stock options and RSUs held as of the date of the TPG Sale.

49.     Defendant Sharad Mansukani served as a Director of Par at the time of the TPG Sale. Defendant Mansukani received cash consideration directly from, or as a subsequent

transferee of, Endo plc totaling approximately $5,351,130, comprised of $946,075 for common stock and $4,405,055 for stock options and RSUs held as of the date of the TPG Sale.

50.     Defendant Keith A. Kucinski served as Vice President Corporate Treasurer at Par at the time of the TPG Sale.  Defendant Kucinski received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $2,231,533, in exchange for stock options and RSUs held as of the date of the TPG Sale.

51.     Defendant Michael J. Altamuro served as Vice President of Marketing and Business Analytics at Par at the time of the TPG Sale.  Defendant Altamuro received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $2,053,548, in exchange for stock options and RSUs held as of the date of the TPG Sale.

52.     Defendant Martin L. Wilson served as Chief Compliance Officer and Vice President of Corporate and Legal Affairs at Par at the time of the TPG Sale.  Defendant Wilson received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $1,985,888, in exchange for stock options and RSUs held as of the date of the TPG Sale.

53.     Defendant Karen A. O'Connor served as Vice President of National Accounts at Par at the time of the TPG Sale.  Defendant O'Connor received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $1,771,199, in exchange for stock options and RSUs held as of the date of the TPG Sale.

54.     Defendant John L. Ameres served as Vice President of Marketing and Business Analytics at Par at the time of the TPG Sale.  Defendant Ameres received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $1,526,909, in exchange for stock options and RSUs held as of the date of the TPG Sale.

11

55.    Hyun Soo Hong served as an officer of Par at the time of the TPG Sale.  Defendant Hong received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $1,493,876, in exchange for common stock held as of the date of the TPG Sale.

56.    Anh Trancaov served as officer of Par at the time of the TPG Sale.  Defendant Trancaov received cash consideration directly from, or as a subsequent transferee of, Endo plc totaling approximately $1,244,910, in exchange for common stock held as of the date of the TPG Sale.

**E.    Doe Defendants**

57.    Each of the Doe Defendants 1-999 is a prospective defendant that, as subsequent discovery may reveal, was involved in the transactions or transfers challenged in this Complaint and/or is a transferee of property involved or affected by such transactions or transfers.  This includes each limited partner of the above-named TPG entities and any other TPG investment manage clients that received a distribution or other value from one or more of the above-named TPG entities on account of the proceeds noted above.

## FACTUAL ALLEGATIONS

**A.    The Opioid Epidemic**

58.    Beginning in the mid-1990s, encouraged by aggressive and deceptive marketing and promotional campaigns, physicians began prescribing opioid pain relievers for a range of non-cancerous pain conditions, contrary to earlier-established medical guidance.  The widespread over-prescription, diversion, and abuse of opioid drugs, and the associated addiction, other injury, and death that followed have devastated lives and communities across the country.

59.    Overdose fatalities are just one measure of the human toll taken by the opioid epidemic. In a 2016 report, the CDC reported that "[o]pioid pain reliever prescribing has

quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[1]    More recently, the CDC reported that "[o]verdoses involving opioids killed nearly 69,000 people in 2020, and over 82% of those deaths involved synthetic opioids."[2]    In total, between 2000 and 2020, more than 270,000 people died of prescription opioid overdoses in the United States.  When looking at deaths involving any opioid, including illicit and prescription opioids, the number increases dramatically to approximately 650,000 deaths from 2000 to 2020.

60.    Prescription opioids also have a causal relationship to overdoses from illicit substances.    Studies have shown that patients who became addicts due to prescriptions start to buy illegal opioids and opiates on the street when they can no longer get prescriptions.  According to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade began with prescription opioids.[3]    Based on data—including findings that people addicted to prescription opioids are 40 times more likely to become addicted to heroin—the CDC identified prescription opioid addiction as the strongest risk factor for heroin addiction.

61.    The opioid crisis in the United States has caused devastating socio-economic fallout.    The CDC concluded that in 2017, when more than 47,000 people died of an opioid overdose and 2.1 million people over the age of 12 suffered from opioid use disorder, the opioid crisis cost the United States as a whole $1.02 trillion: $480.7 billion in the value of lives lost; $471

---

[1] Rose A. Rudd et al., *Increases in Drug and Opioid Overdose Deaths—United States, 2000-20014*, CDC, https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm (Jan. 1, 2016).

[2] *The Drug Overdose Epidemic: Behind the Numbers*, CDC, https://www.cdc.gov/opioids/data/index.html#:~:text=Overdose%20deaths%20involving%20opioi ds%2C%20including,than%20eight%20times%20since%201999.&text=Overdoses%20involving %20opioids%20killed%20nearly,those%20deaths%20involved%20synthetic%20opioids (June 1, 2022).

[3] *Opioid Addiction 2016 Facts & Figures*, Am. Soc'y of Addiction Med., https://www.asam.org/docs/default-source/advocacy/opioid-addiction-disease-facts-figures.pdf.

billion in the costs of opioid use disorder; almost $35 billion in health care and opioid use disorder

treatment; and $14.8 billion in criminal justice spending.[4]    The CDC had previously calculated

that prescription opioid misuse alone imposed total economic costs of $78.5 billion each year.[5]    In

2018, the Altarum Institute, a nonprofit healthcare research and consulting firm, released a study

underscoring the cost of the opioid crisis through 2016 and estimating its growth beyond.[6]    The

burden of the opioid crisis comes in many forms:  lost wages and productivity; increased health

care costs; lost tax revenue at the local, state, and federal levels; and higher spending on social

services, education, and criminal justice.    The Altarum study estimates the socio-economic impact

of the opioid crisis between 2001 and 2016 to be $1 trillion.[7]

      62.    The Altarum study also highlights how the cost of the opioid crisis has increased

exponentially over time.    In 2001, the annual cost was $29.1 billion.    By 2006, the annual impact

rose to $48.7 billion.[8]    By 2007, it was $60.9 billion and then $95.8 billion in 2016 when the study

was conducted.[9]    Based on the rapidly escalating costs observed from 2011 to 2016, Altarum

---

[4] *The Economics of Injury and Violence Prevention*, CDC,
https://www.cdc.gov/injury/features/health- econ-cost-of-injury/index.html (Dec. 6, 2021).

[5] Curtis Florence et al., *The Economic Burden of Prescription Opioid Overdose, Abuse and Dependence in the United States, 2013*, at 1 (Wolters Kluwer Health, Inc. 2016),
https://stacks.cdc.gov/view/cdc/55377/cdc_55377_DS1.pdf.

[6] *Economic  Toll of Opioid Crisis  in U.S. Exceeded  $1Trillion Since 2001,* Altarum,
https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001 (Feb. 13, 2018);
*see also* Corwin N. Rhyan, *The Potential Societal Benefit of Eliminating Opioid Overdoses, Deaths, and Substance Use Disorders Exceeds $95  Billion per Year*, Altarum (Nov. 16, 2017),
http://altarum.org/sites/default/files/uploaded-publication-files/Research-Brief_Opioid-Epidemic-Economic-Burden.pdf.

[7] *Economic  Toll of Opioid Crisis  in U.S. Exceeded  $1Trillion Since 2001*, Altarum,
https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001 (Feb. 13, 2018).

[8] *Id.*

[9] *Id.*

estimated that, between 2017 and 2020, the opioid crisis would cause an additional $500 billion in economic harm.[10]

### B.    Par's Opioid Business

63.    Founded in 1978, Par quickly established itself in the generic drug industry. However, soon after it went public in 1984, the company ran into legal troubles.  In 1989, the company and two of its executives pleaded guilty to charges of bribing FDA officials in exchange for fast approvals for generic drugs.  Two years later, the company pleaded guilty to 10 charges involving falsified applications for drug approvals and other infractions and agreed to pay $2.5 million in fines.

64.    Over the following decades, Par refocused its business in large part as a producer of generic opioid pain pills.  By 2006, Par had more than 700 employees and was describing itself as "the world's sixth largest manufacturer and distributor of generic pharmaceuticals."

65.    In 2010, Par hired a third-party DEA compliance auditor to review its handling of controlled substances.  The auditor concluded that Par was in violation of 21 C.F.R. § 1301.74(b) due to its lack of a Suspicious Ordering Monitoring system ("SOM").  The auditor's report quoted that regulatory provision, which requires that registrants "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and that "[t]he registrant shall inform the Field Division Office of the [DEA] in his area of suspicious orders when discovered by the registrant."  The auditor counseled in no uncertain terms that an SOM program "must be instituted" to bring Par into compliance.

66.    Notwithstanding that clear instruction from the auditor in 2010 to institute such an SOM, Par failed to do so.  In April 2012, Par ostensibly created an SOM, embodied in Standard

---

[10] *Id.*

15

Operating Procedure ("SOP") No. SO002, but this was a device to drive sales, not compliance. It was simply a token effort, not designed to disclose suspicious orders.

67.     Indeed, the SOP's design minimized interference with sales and profits while appearing on the surface to comply with the DEA regulations. The ostensible SOM depended on customers' own self-reporting to determine thresholds requiring further inquiry. But even when exceeded, these thresholds could be modified by Par's *sales* team on the basis of a conversation with the customer. The so-called SOM had no instructions for defining suspicious orders or reporting them to the DEA.

**C.     TPG's Domination and Control of Par**

68.     TPG is a private equity firm that operates through various investment advisors, general partners, fund vehicles, fund managers, and special purpose vehicles, including co-investment vehicles, that hold stock in TPG portfolio companies.

69.     In September 2012, TPG led an investor group in a leveraged buyout transaction that took Par private as a wholly owned subsidiary of TPG and its affiliated funds. TPG's buyer consortium invested approximately $738 million of equity in the deal.

70.     As relevant here, Par was a portfolio company within the TPG fund known as TPG Partners VI, L.P. ("Fund VI"). TPG Capital, L.P. and TPG Global, LLC were the investment advisors to Fund IV. The manager of Fund VI was TPG VI Management, LLC. The general partner of Fund VI was TPG GenPar VI, L.P. The shares of Par were held through TPG Sky L.P. ("Sky"), TPG Sky Co-Invest, L.P. ("Sky Co-Invest"), and TPG Biotechnology Partners IV, L.P. ("Biotech IV"). The general partner of Sky was TPG Advisors V, Inc. The general partner of Sky Co-Invest was TPG Advisors VI, Inc. The general partner of Biotech IV was TPG Biotechnology GenPar IV, L.P.

71.    These entities are referred to collectively as "TPG".  For purposes of their control and domination of Par, as relevant to this Complaint, these TPG entities all operated as a single economic enterprise and were alter egos of each other.  They all share the same business address in Fort Worth, Texas.  They have overlapping and interlocking officers, directors, and personnel. The special purpose vehicles holding Par stock lack discretion over their business activities and were controlled and dominated by their general partners, managers, and/or investment advisors. And they failed to observe corporate formalities and blurred the lines between themselves, including as reflected in public securities filings, including for example a Form S-1 filed with the SEC on April 17, 2015, which represented that Par was acquired collectively, "by investment funds affiliated with TPG Global, LLC (together with its affiliates, 'TPG' or the 'Sponsor') and certain co-investors."

72.    Following the take-private, TPG immediately took over complete domination and control of Par so that it functioned only as an alter ego of TPG.

73.    Par was a "controlled company" within the meaning of the rules of the United States Securities and Exchange Commission ("SEC"), and TPG operated Par without complying with the corporate governance requirements of the New York Stock Exchange ("NYSE").  Par's board wholly lacked independence: TPG directors occupied a majority of board seats; the compensation committee would no longer be composed entirely of independent directors; and even the nominating and corporate governance committee itself was to be dominated by TPG.

74.    TPG's directors on the Par board had irreconcilable conflicts of interest because they owed fiduciary duties directly to TPG, as controlling owner of the business.  As of March 31, 2015, the Par board was comprised of five directors, all of whom were nominated to serve on the Par board by TPG: Paul V. Campanelli, Patrick G. LePore, Todd B. Sisitsky, Jeffrey K. Rhodes

and Sharad Mansukani.  Two of those were partners of TPG: Todd B. Sisitsky and Jeffrey K.

Rhodes.  A third, Sharad Mansukani, was a senior advisor to TPG.  A fourth, Paul Campanelli, was

promoted to CEO of Par by TPG in 2012, at which time TPG also appointed him to be a director

of the Company.  Although Sisitsky and Rhodes did not receive compensation for their board

service directly from Par because they were paid directly by TPG in connection with their roles at

TPG, Mansukani was compensated from the Par coffers, receiving nearly $500,000 in total

compensation in 2014 alone.

75.    In connection with TPG's buyout, Par entered into three key control agreements

with TPG that solidified TPG's control over the management and operations of Par.  These

agreements included a management stockholders agreement, management services agreement, and

a management rights agreement.  Among other things, the management stockholders agreement

gave TPG control rights over Par management by requiring management to vote on certain matters

as directed by TPG.  Because the Par board was at all relevant times dominated and controlled by

TPG through its directors, whose loyalty was irreconcilably compromised, TPG's ability to control

management's votes ensured that TPG would be free to exercise complete domination over Par

with no checks or balances whatsoever.  This control was further highlighted by TPG's "drag along

rights" that enabled TPG to be able to force management to sell their shares at TPG's direction, or

the "lock up" agreement that TPG was able to employ to ensure management would not transfer

their shares without TPG's consent.

76.    TPG's control did not stop with the stockholders agreement.  Through the

management services agreement, TPG was able to ensure it controlled and dominated the

management, operations and finances of Par while itself profiting handsomely from its control.

That is, through the management services agreement, an affiliate of TPG provided management,

consulting, and financial services to Par in exchange for up to $4 million per year in management fees. The ceiling on the management fees available was lifted, however, in the event of certain types of successful transactions involving Par. As a result, during one five-month period in 2012, TPG paid itself a total of $20.7 million in aggregate fees and out-of-pocket expenses in connection with its management of Par.

77.    Finally, pursuant to the management rights agreement, TPG solidified its right to control the board by ensuring it would always have the right to appoint at least one member of the board of directors of Par regardless of its ownership stake in the company—these rights were vested in TPG so long as it had *any direct or indirect interest* in the company. TPG also gained critical information rights entitling TPG to receive copies of any notices or other materials provided to the Par board at the same time as the board members themselves. Finally, the management rights agreement explicitly vested TPG with the right to consult and advise management of the company and any of its subsidiaries. This contractual right allowed TPG to further infiltrate the management of Par in all areas not expressly covered by the management services agreement.

### D.    Par's and TPG's Continued Misconduct in the Sale of Generic Opioids.

78.    Under control and domination by TPG, Par accelerated its sales of generic opioids and continued to ignore clear warnings of the devastation it was causing and the liability risks for Par's stakeholders. Indeed, all along, TPG's investment thesis in taking Par private was to drive its sale of generic opioids to fuel profitability, without the scrutiny that comes with being a publicly-traded company.

79.    In addition to employing a self-evidently non-compliant SOM, Par failed to comply with the regulatory requirement that it *report* suspicious orders to the DEA. It appears that Par

failed to report to the DEA as suspicious even one order of opioid products among its significant

sales *nationwide* between at least April 2012 and Par's acquisition by Endo.

80.     In contrast, one of Par's competitors in the manufacture and sale of generic opioids

was reporting well over 150 suspicious orders to the DEA each year during that period *in an*

*average state*.

81.     Notwithstanding these red flags, TPG caused Par to continue flooding the country

with more and more generic opioids.   During the three years TPG owned Par, its

oxycodone/hydrocodone pill market share increased from 15.7% to 24.8% of the market—from

1.7 billion to 3.0 billion pills a year.

### E.     TPG's Awareness of Its Opioid-Related Liability

82.     TPG was acutely aware of Par's wrongful conduct and the enormous financial

consequences of that conduct.   Numerous studies had been widely publicized that demonstrated

that the harm caused by the opioid epidemic was in the hundreds of billions of dollars.   Details of

the human, societal, and financial costs of prescription opioid use were widely publicized.

Governmental fines and settlements relating to opioid-related conduct were public knowledge.

83.     Par's opioid business was subject to extensive regulation and regulatory oversight

from both the federal government and the states within which it operated.   Par was well-aware of

Par's obligation to comply with laws and regulations governing to the manufacture and sale of

opioid products.   For example, PPCI's annual reports would disclose that:

> The development, manufacturing, sales, marketing and
> distribution of our products are subject to extensive regulation by
> the U.S. federal government, principally the FDA, and, as
> applicable, the Drug Enforcement Agency, FTC and state and
> local governments. For both currently marketed and future
> products, failure to comply with applicable regulatory
> requirements can, among other things, result in suspension of
> regulatory approval and possible civil and criminal sanctions.
> Regulations, enforcement positions, statutes and legal

> interpretations applicable to the pharmaceutical industry are
> constantly evolving and are not always clear. Significant changes
> in regulations, enforcement positions, statutes and legal
> interpretations could have a material adverse effect on our
> financial condition and results of operations.
>
> . . . .
>
> The FDCA, the Controlled Substances Act and other federal
> statutes and regulations govern the development, testing,
> manufacture, safety, effectiveness, labeling, storage, record
> keeping, approval, import and export, and advertising and
> promotion of our products. Non-compliance with applicable
> regulations can result in judicially and/or administratively
> imposed sanctions, including the initiation of product seizures,
> injunctions, fines and criminal prosecutions.

84.    Disclosures along these lines are found on every one of PPCI's Form 10-Ks dating back to least 2010.

85.    In August 2004, doctors from the University of Wisconsin-Madison presented a study that showed the trends in the medical use and abuse of frequently prescribed opioid analgesics including oxycodone from 1997-2002.[11]    The study showed that oxycodone usage increased by over 400% and abuse increased over 346% between 1997 and 2002.[12]    The College on Problems of Drug Dependence noted that, as of April 1, 2003, "the prevalence of prescription opioid abuse appears to be similar to that of heroin and cocaine."[13]

86.    In 2006, Howard Birnbaum and his coauthors published an economic study in the *Clinical Journal of Pain* estimating $8.6 billion of quantifiable societal harm from prescription

---

[11] *See* James Zacny et al., *College on Problems of Drug Dependence Taskforce on Prescription Opioid Non-Medical Use and Abuse: Position Statement*, 69 Drug and Alcohol Dependence 215, 215-232 (2003).

[12] *See id.*

[13] *Id.* At 215.

opioid dependence for the year 2001.[14]  It found that prescription opioid dependence generated

substantial health care costs ($2.6 billion), criminal justice costs ($1.4 billion), and workplace costs

($4.6 billion).[15]

87.    In 2007, 26 states and the District of Columbia settled certain investigations into

Purdue Pharma's aggressive and deceptive marketing of its opioid pain relievers, most notably

OxyContin, for $19.5 million.[16]    The investigations alleged that Purdue pushed prescribers to

advise patients to take OxyContin every 8 hours instead of the 12-hour doses approved by the

FDA.[17]  The settlement required Purdue to implement further internal controls and to stop basing

bonuses solely on the volume of OxyContin prescribed.[18]    Reporting at the time noted that

OxyContin "can be highly addictive," and "can produce a heroinlike high if crushed and then

swallowed, inhaled or injected."[19]

88.    Also in 2007, Purdue Frederick Company, an affiliate of Purdue Pharma, pleaded

guilty to one felony count of misbranding OxyContin, with the intent to defraud or mislead.[20]

Three corporate officers also pleaded guilty to a misdemeanor charge of misbranding, solely in

their capacity as responsible corporate officers.[21]    Among other things, Purdue Fredrick Company

---

[14] Howard G. Birnbaum et al., *Estimated Costs of Prescription Opioid Analgesic Abuse in the United  States in 2001: A Societal Perspective*, 22 Clinical J. Pain 667, 667-676 (2006).

[15] *Id.*

[16] Associated Press, *Painkiller's    Maker Settles Complaint*,    N.Y.    Times (May  9, 2007), https://www.nytimes.com/2007/05/09/business/09purdue.html.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] Opinion & Order at 1, *United States v. Purdue Frederick Co.*, No. 1:07-CR-00029-JPJ (W.D. Va. July 23, 2007), D.I. 77.

[21] *Id.* at 2.

admitted that from 1995 to 2001 it "marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications," despite knowing that these claims were untrue.[22]  As part of the plea agreement, Purdue Frederick agreed to pay over $600 million in fines and various other payments to settle related civil claims, one of the largest monetary sanctions imposed in the history of the pharmaceutical industry at that time.[23]   The Purdue guilty pleas and settlements were national news and followed closely by those in the opioid industry.

89.    In 2011, Ryan Hansen and his coauthors published an economic study in the *Clinical Journal of Pain* that estimated $53.4 billion of quantifiable societal harm from prescription opioid dependence for the year 2006.[24]   Among other things, the study estimated that $2.2 billion went to substance abuse treatment, including for hospitals, physician services, and substance treatment facilities.[25]   Deaths from opioid poisoning resulted in $12.4 billion in lost productivity, and unemployment and sub-employment that resulted from opioid abuse generated $14.7 billion in costs.[26]   Incarceration accounted for $14.8 billion of the cost, while other criminal justice costs accounted for $8.8 billion of the total.[27]   This study cited the 2006 Birnbaum study and noted that its increased estimate was largely "attributable to inflation and to the considerable

---

[22] *Id.*

[23] *Id.* at 5-6.

[24] Ryan N. Hansen et al., *Economic Costs of Nonmedical Use of Prescription Opioids*, 27 Clinical J. Pain 185, 194-202 (2011).

[25] *Id.* at 197.

[26] *Id.*

[27] *Id.* at 198.

increase in the prevalence of nonmedical use of prescription opioids during the period 2001 to 2006."[28]

90.    In 2011, Howard Birnbaum and his coauthors published another economic study that estimated $55.7 billion of quantifiable societal harm from prescription opioid dependence for the year 2007.[29]    The study concluded that in 2007 alone, lost workplace productivity accounted for $25.6 billion, health care costs accounted for $25.0 billion, and criminal justice costs accounted for $5.1 billion.[30]    Included in lost workplace productivity were the costs of premature death ($11.2 billion) and lost wages or employment ($7.9 billion), among other costs.[31]    The study noted that, in 2007, "12.5 million Americans had used prescription pain relievers for nonmedical purposes" and "that the number of patients admitted to substance abuse treatment facilities due to nonheroin opiate/opioid abuse nearly quadrupled from 23,000 to more than 90,000 from 1999 to 2007."[32] However, the study focused only "on costs of patients diagnosed with opioid abuse" and did "not account for *undiagnosed* opioid abuse."[33]    The study concluded that "it is clear that the costs of opioid abuse have increased substantially due to changes in the prevalence of opioid abuse and associated costs."[34]    Both of these studies were well known in the opioid industry.

91.    By 2011, at least eight settlements totaling approximately $750 million were reached between governmental entities (specifically state governments and the Department of

---

[28] *Id.* at 198, 200.

[29] Howard G. Birnbaum et al., *Societal Costs of Prescription Opioid Abuse, Dependence, and Misuse in the United States*, 12 Pain Med. 535, 661 (2011).

[30] *Id.*

[31] *Id.*

[32] *Id.* at 657.

[33] *Id.* at 658.

[34] *Id.* at 662.

Justice) and certain opioid manufacturers and distributors.    In addition to the well-publicized

settlements with Purdue, those settlements included the following:

       a.     In 2008, Cardinal Health agreed to pay $34 million in fines for failure to

report suspicious orders.[35]

       b.     In 2008, McKesson agreed to pay a $13.25 million civil penalty for failure

to properly monitor and report suspicious orders.[36]

    92.    It had become evident that the number of lawsuits and enforcement actions were

increasing throughout the industry.

    93.    TPG was aware of the issues facing Par as a result of its control of the company

board, active role in managing the company, and its extensive information rights, which entitled

TPG to receive the same information as the Par directors—at the same time.

### F.    TPG's Sale of Par to Endo

    94.    In 2015, five years after its previous one, Par conducted another DEA compliance

audit.   That audit condemned Par's SOM and prescribed that Par's "entire approach to SOM should

be [re-]evaluated."   Based in part on the system's failure to measure indicia of suspicious orders

identified in the regulations, the auditor concluded that "Par's current SOM system as it currently

operates may be difficult to explain and defend during a DEA review" and that "Par Pharma's SOM

system may be difficult to defend during a DEA SOM audit."   The auditor instructed Par to replace

SOP No. SO002 with a "Defensible" SOM.

---

[35] Mary Beth Rhodes, *A Brief History of the Opioid Crisis and Current Environment*, Hanover,  https://www.hanover.com/businesses/business-customer-resources/hanover-risk-solutions/brief-history- opioid-crisis-and (last visited Oct. 3, 2022).

[36] Press Release, U.S. Dep't of Justice, McKesson agrees to pay record $150 million settlement for failure to report suspicious orders (Jan. 17, 2017), https://www.justice.gov/opa/pr/mckesson-agrees-pay-record- 150-million-settlement-failure-report-suspicious-orders.

95.    The auditor also vigorously criticized the existing SOM's reliance on sales team members rather than on employees in Par's compliance division.  And, above all, the auditor stressed that SOP No. SO002 "misses the point of the regulations" by not requiring all suspicious orders to be reported "as soon as they are identified."

96.    By this point, TPG had seen the large and ever-increasing fines and penalties being imposed on companies for their opioid-related practices.  TPG was aware that Par had engaged in similar misconduct.  With the writing on the wall, TPG undertook a two-part scheme first to extract value from Par through a dividend to itself; and then second, to conduct a sale process to rid itself of the mounting liabilities and pawn off Par to an unsuspecting buyer.

   a.    The TPG Dividend

97.    In February 2015, TPG caused Par to pay a dividend to its shareholders in the amount of $493.3 million (the "TPG Dividend").  This dividend went almost exclusively to TPG and its insiders, who held the entirety of Par's outstanding stock.

98.    TPG caused Par to raise a corresponding amount of senior secured debt to fund this dividend, saddling an already insolvent Par company with even more debt.

99.    Par received no value in exchange for the TPG Dividend, let alone reasonably equivalent value.

   b.    The Par Sale

100.    In May 2015, Endo plc announced that it had agreed to buy Par Pharmaceutical Holdings, Inc. from TPG for $8.05 billion.  The acquisition closed in September 2015, and in accordance with the terms of the merger agreement, the purchase price consisted of approximately 18 million shares of Endo equity and $6.5 billion in cash consideration.

101.    TPG and its affiliates, including TPG Sky L.P., TPG Sky Co-Invest L.P., and TPG

Biotechnology Partners IV, L.P., received cash consideration directly from, or as subsequent

transferees of, Endo plc totaling approximately $3,864,321,516.

102.    The Individual Defendants received cash consideration directly from, or as

subsequent transferees of, Endo plc totaling approximately $183,835,254.

**G.    Endo's Insolvency At the Time of the Transactions**

103.    At the time of the transactions, Endo was a publicly-traded global manufacturer of

specialty and generic pharmaceutical drugs and medical products.

104.    Historically one of the largest manufacturers of opioids in the United States, Endo's

portfolio included powerful opioid products such as Opana ER (oxymorphone hydrochloride

extended release).  Oxymorphone, the active ingredient in Opana ER, is an opioid analgesic three

times more potent than morphine.  And a single Opana ER tablet contained far more morphine

milligram equivalents than contained in otherwise comparable, so-called "immediate-release"

prescription opioids—creating enormous potential for abuse.

105.    Both in its original formulation, and as later reformulated, Opana ER could be

manipulated to release all 12 hours' worth of opioids at once, producing an intense high and greatly

increasing the risk of addiction and overdose from even one use.   This characteristic resulted in

the rampant abuse of Opana ER both before and after its reformulation.

106.    The systematic abuse of Opana ER occurred against the backdrop of the "opioid

epidemic"—a public health crisis developing across the country characterized by widespread

addiction, diversion, and overdoses caused by opioids.

107.    At the time of Opana's entry into the opioid market, the medical consensus was that

use of opioids should be restricted to address short-term acute pain, pain related to cancer, or end-

of-life pain.    Opioids were viewed as unsuitable to treat less severe chronic pain due to their

addictive properties.

108.    To increase revenues, Endo launched a marketing campaign to convince medical

professionals and patients that Endo's opioids, including Opana ER, were safe to use in high doses

for a broader variety of pain ailments.  In doing so, Endo engaged in misleading marketing that,

among other things, overstated the benefits of opioid products and understated the risks to users

and targeted and compensated physicians known to prescribe large quantities of opioids.  These

practices expanded the prescription and use of non-medically necessary opioid products, which in

turn led to even more abuse and diversion.

109.    Indeed, Reformulated Opana ER was so widely abused that by 2012, Opana ER

had surpassed abuse rates of Purdue Pharma's notorious opioid product OxyContin.   FDA data

further demonstrated that per dosing unit, Reformulated Opana ER had four times as many

incidents of intentional abuse of OxyContin between 2013 and 2016.  And, in 2014 and 2015,

Reformulated Opana ER was so popular among individuals who had become addicted to opioids

that the drug sold on the street for as much as $100 to $150 per pill.

110.    All told, Endo and certain of its affiliates have been named as defendants in over

3,500 lawsuits seeking to hold such Debtors liable for their marketing and sale of certain opioid

products (the "Opioid Lawsuits").

111.    The majority of the Opioid Lawsuits were filed on behalf of governmental entities,

including states, counties, municipalities, and other political subdivisions; plaintiffs also include

private hospitals, individuals seeking damages for alleged personal injuries, and third-party payors

seeking damages for alleged economic injuries (collectively, the "Opioid Plaintiffs").  The

overwhelming majority of the Opioid Lawsuits have been filed in the U.S.; a handful have been filed in Canada as proposed class actions.

112.    The facts and liability underlying these lawsuits rendered Endo insolvent throughout the entire period it engaged in the avoidable transfers.  While the tidal wave of litigation drove Endo into bankruptcy in 2022, claims underlying them arose before then.  In 2016, shortly after the Par Sale, the Company ceased promoting the Opana medications and all other opioid products to healthcare providers in the U.S., eliminated its entire U.S. pain salesforce, and discontinued all R&D of new opioid products.  In 2017, at the request of the FDA, the Company finally removed Opana ER from the market.

113.    Endo's opioid-related activities even drew claims from the U.S. Department of Justice, which also launched a criminal investigation into Endo's opioid marketing and the federal government's possible overpayment for Endo medications.  The face value of the federal government's claims, standing alone, exceeded $7 billion and resulted in a criminal guilty plea. As these liabilities began to materialize, Endo's market valuation plummeted, declining from $13.5 bn in 2015 to $1.7 bn in 2017.

114.    As will be established at trial, including through expert evidence, even under conservative estimates, the magnitude of the Debtors' opioid liabilities rendered the Endo enterprise insolvent years before its eventual bankruptcy.

**H.      Authority to Prosecute Causes of Action for the Benefit of the Endo Estates and Creditors**

115.    The Trust has standing and authority to prosecute and enforce all claims and causes of action arising from the matters set forth in this Complaint that (a)(i) belonged to the Debtors' bankruptcy estates under 11 U.S.C. § 541, or (ii) are exercisable by a bankruptcy trustee in

accordance with 11 U.S.C. §§ 544(b) and 550 or other provisions of the Bankruptcy Code; and (b) were transferred to the Trust under the Plan.

116.    Under § 544(b)(1) of the Bankruptcy Code, the Trust "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of [the Bankruptcy Code]."  There exist one or more unsecured creditors, including the U.S. Internal Revenue Service (the "IRS"), who, on the Petition Date, held allowable unsecured claims and timely rights to avoid the Par Sale Transfers and TPG Dividend under, without limitation, the Uniform Voidable Transactions Act, as in force in several states, and the Uniform Fraudulent Transfer Act ("UFTA"), as in force in numerous states.

117.    These unsecured creditors include children who were born within one year prior to the Petition Date with NAS as a result of being exposed to opioids during pregnancy.  These creditors also include individuals injured by direct exposure to opioids within one year prior to the Petition Date.  Until these children were born and diagnosed with NAS, or until those individuals became injured as a result of direct opioid exposure, they and their family members did not know, and could not reasonably discover, that their recourse against the Debtors had been impaired by the Par Sale Transfers.  In accordance with the Confirmation Order and the Plan, the Trust wields all avoidance rights derived from these NAS children and opioid personal-injury victims under § 544(b)(1) of the Bankruptcy Code.  Such rights include the right to avoid the TPG Dividend under section 4(a)(1) of the UFTA within one year after the same "was or could reasonably have been discovered" by these recent creditors.  *See* UFTA § 9(a).

118.    The Debtors' creditors also include various state and federal taxing authorities, such as the IRS, which filed several claims in the Debtors' Bankruptcy Case.  In accordance with the

Confirmation Order and the Plan, the Trust wields all avoidance rights derived from the IRS as of the Petition Date, including, without limitation, the right to seek avoidance of transfers or obligations by way of the Fraudulent Transfer Claims, under the doctrine *nullum tempus occurrit regi* ("*Nullum Tempus*") with respect to otherwise applicable statutes of limitation.

119.    In addition to the IRS, one or more other governmental units, on information and belief, held allowable unsecured claims against one or more of the Debtors as of the Petition Date, together with timely rights to avoid the Par Sale Transfers and the TPG Dividend by way of the Fraudulent Transfer Claims, pursuant to the *Nullum Tempus* doctrine as to otherwise applicable statutes of limitation.   In accordance with the Confirmation Order, the Plan, and 11 U.S.C. § 544(b)(1), the Trust wields all rights derived from these other governmental units.

## CLAIMS FOR RELIEF

### COUNT I
### Avoidance of the Par Sale Transfers as Constructive Fraudulent Transfers – UFTA or Other Applicable Law

120.    The Trust repeats and realleges all the allegations in paragraphs 1 through 119.

121.    The Debtors made the Par Sale Transfers to or for the benefit of Defendants, including but not limited to the following:

| Defendant | Amount Received |
|---|---|
| TPG Sky L.P. | $ 3,036,089,316 |
| TPG Sky Co-Invest L.P. | $ 790,887,156 |
| TPG Biotechnology Partners IV L.P. | $ 37,345,044 |
| Park Street Investors L.P. | $ 9,958,735 |
| Paul Victor Campanelli | $ 41,825,036 |
| Thomas Joseph Haughey | $ 20,606,840 |
| Terrance Coughlin | $ 11,723,523 |
| Patrick LePore | $ 13,671,169 |
| Barry J. Gilman | $ 5,039,811 |
| Joseph A. Barbarite | $ 4,396,225 |
| Chad M. Gassert | $ 3,999,594 |

| | | |
|---|---|---|
| Stephen O. Montalto | $ | 3,994,754 |
| Antonio Pera | $ | 4,228,290 |
| Muthusamy Shanmugam | $ | 3,222,827 |
| Stephen Carey | $ | 3,200,122 |
| Suketu P. Sanghvi | $ | 2,875,410 |
| Lawrence Milton Brown | $ | 2,858,064 |
| Phillip John Brancazio | $ | 2,942,688 |
| Diane Montalto | $ | 2,800,060 |
| Sharad Mansukani | $ | 5,351,130 |
| Keith A. Kucinski | $ | 2,231,533 |
| Michael J. Altamuro | $ | 2,053,548 |
| Martin L. Wilson | $ | 1,985,888 |
| Karen A. O'Connor | $ | 1,771,199 |
| John L. Ameres | $ | 1,526,909 |
| Hyun Soo Hong | $ | 1,493,876 |
| Anh Trancao | $ | 1,244,910 |

122.    At the time of the Par Sale Transfers, the Debtors were faced with present, contingent, and future opioid-related liabilities that, collectively, were overwhelming.

123.    The Debtors made the Par Sale Transfers when they were engaged or about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

124.    At the time of the Par Sale Transfers, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

125.    At the time of the Par Sale Transfers, the Debtors were insolvent within the meaning of applicable law, or the Debtors became insolvent as a result of the Par Sale Transfers.

126.    As a result of the Par Sale Transfers, the Debtors and their creditors have been harmed.

127.    Accordingly, under 11 U.S.C. §§ 544(b) and 550(a), the UFTA, and/or other applicable law, the Trust is entitled to avoid the Par Sale Transfers and recover the property or

value transferred to, or for the benefit of, Defendants, their affiliates, limited partners, or other subsequent transferees, including each of the Doe Defendants, with interest.

128.    The conduct set forth herein was fraudulent, wanton, malicious, or willful in complete disregard of the Debtors' rights. Accordingly, the Trust requests relief in the form of exemplary or punitive damages in an amount to be determined at trial.

**COUNT II**
**Avoidance of the TPG Dividend Based on Intent to Hinder, Delay, or Defraud Creditors –**
**UFTA or Other Applicable Law**

129.    The Trust repeats and realleges all the allegations in paragraphs 1 through 128.

130.    Par made the TPG Dividend with actual intent to hinder, delay, or defraud present and future creditors to which the Debtors were or became indebted, on or after the dates those transfers were made.

131.    The intent to hinder, delay, or defraud Par's creditors, including present and future Opioid Claimants, is apparent from, inter alia, the direct and natural consequence of the TPG Dividend prejudicing the rights of creditors by depriving the Debtors and their bankruptcy estates of the value of the TPG Dividend.

132.    Such intent is also apparent from abundant "badges of fraud," including the following:

      a.     The TPG Dividend was to or for the benefit of insiders, namely TPG.

      b.     At the time of the TPG Dividend, Par was dominated and controlled by TPG such that Par was the alter ego or mere instrumentality of TPG. TPG used its control over Par to cause the issuance of the TPG Dividend, to the detriment of the Debtors' estates and their creditors.

      c.     Par and TPG were aware of the burgeoning opioid-related liabilities when the TPG Dividend was being planned and was ultimately implemented.

33

    d.    Par received no value, let alone reasonably equivalent value, in exchange for the TPG Dividend.

    e.    Par was insolvent at the time of the TPG Dividend, became insolvent soon thereafter, or had reason to know at the time of the TPG Dividend that the liabilities for present and future opioid claims would exceed their ability to pay.

133.    Accordingly, under 11 U.S.C. §§ 544(b) and 550(a), the UFTA, and/or other applicable law, the Trust is entitled to (a) avoid the transfers of assets or property made in connection with the TPG Dividend, and (b) recover the value of assets or property transferred to, or for the benefit of, TPG, its affiliates, limited partners, or other subsequent transferees, including each of the Doe Defendants, with interest.

134.    TPG's and Par's conduct set forth herein was fraudulent, wanton, malicious, and/or willful in complete disregard of the Debtors' rights.  Accordingly, the Trust requests relief in the form of exemplary or punitive damages in an amount to be determined at trial.

## COUNT III
### Avoidance of the TPG Dividend as Constructive Fraudulent Transfers – UFTA or Other Applicable Law

135.    The Trust repeats and realleges all the allegations in paragraphs 1 through 134.

136.    Par made the TPG Dividend to or for the benefit of Defendants.

137.    At the time of the TPG Dividend, Par was faced with present, contingent, and future opioid-related liabilities that, collectively, were overwhelming.

138.    At the time of the TPG Dividend, Par intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

139.    At the time of the TPG Dividend, Par was insolvent within the meaning of applicable law, or Par became insolvent as a result of the TPG Dividend.

34

140.    As a result of the TPG Dividend, Par and its creditors have been harmed.

141.    Accordingly, under 11 U.S.C. §§ 544(b) and 550(a), the UFTA, and/or other applicable law, the Trust is entitled to avoid the TPG Dividend and recover the property or value transferred to, or for the benefit of, TPG, its affiliates, limited partners, or other subsequent transferees, including each of the Doe Defendants, with interest.

142.    Defendants' conduct set forth herein was fraudulent, wanton, malicious, or willful in complete disregard of the Debtors' rights.    Accordingly, the Trust requests relief in the form of exemplary or punitive damages in an amount to be determined at trial.

### COUNT IV
### Reimbursement, Indemnification, and/or Contribution

143.    The Trust repeats and realleges all the allegations in paragraphs 1 through 142.

144.    Prior to the Petition Date, the Debtors were the subject of subpoenas, investigations, and more than 3,000 lawsuits arising from or related to the Debtors' substantial opioid liability. On information and belief, in connection with those subpoenas, investigations, and lawsuits, the Debtors paid hundreds of millions of dollars in pre-bankruptcy, opioid-related settlements, and substantial legal fees in defending opioid lawsuits.

145.    Moreover, the Debtors incurred substantial costs and expenses to reach a global settlement and resolution of their substantial opioid liability in the Bankruptcy Case, including the allowance and/or payment of professional fees and expenses in excess of $240,000,000, in addition to the over $1.3 billion that the Debtors are required to pay on account of opioid claims under the Plan.

146.    TPG is jointly and severally liable with the Debtors for opioid-related liability and claims borne by or asserted against the Debtors based on TPG's conduct as the previous owner of

Par. The Debtors have paid sums in excess of their fair share on account of, or as a result of, such opioid-related liability and claims.

147.    Accordingly, as a matter of, *inter alia*, law, equity and/or good conscience, to the extent damage was caused by TPG as the previous owner of Par, the Trust is entitled to reimbursement, indemnification, or contribution by or from TPG for (a) payments of indemnity and defense costs made by one or more of the Debtors in connection with, or as a result of, opioid-related subpoenas, investigations, litigation, judgments, fines, and settlements, and (b) payments made by one or more of the Debtors to satisfy (i) all professional fees and costs, allowed administrative expenses, quarterly fees, and other costs related to the Bankruptcy Case and (ii) obligations under the Plan, in an amount to be determined at trial.

## <u>RESERVATION OF RIGHTS</u>

148.    The Trust intends to conduct further investigation and discovery in relation to the Par Sale Transfers. The Trust therefore expressly reserves the right to bring additional claims, including, without limitation, claims discovered as a result of the Trust's ongoing efforts to obtain additional information from the Debtors, Defendants, and parties affiliated with Defendants related to the Par Sale Transfers and the bankruptcies of the Debtors.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, based on the foregoing, the Trust requests judgment in its favor and relief as follows:

A.    finding that TPG dominated and controlled Par and operated it as a single enterprise, such that TPG was the alter ego of Par during the relevant period;

B.    avoiding each of the Par Sale Transfers in accordance with Section 544(b) of the Bankruptcy Code;

C.      in accordance with section 550 of the Bankruptcy Code, awarding recovery by the Trust of the value of all avoided Par Sale Transfers;

D.      awarding compensatory damages in favor of the Trust for all damages sustained as a result of transfers or obligations avoided, or any of Defendants' wrongdoing, in an amount to be determined at trial;

E.      awarding the Trust punitive and/or exemplary damages where such damages are available, in an amount to be determined at trial;

F.      awarding in favor of the Trust reimbursement, indemnification, or contribution by or from Defendants, to the extent  caused by conduct prior to the acquisition, for (1) payments of indemnity and defense costs made by one or more of the Debtors on or before the Petition Date in connection with, or as a result of, opioid-related subpoenas, investigations, litigation, judgments, and settlements, and (2) payments made by one or more of the Debtors to satisfy (i) all professional fees and costs, allowed administrative expenses, quarterly fees, and other costs related to the Bankruptcy Case and (ii) obligations under the Debtors' confirmed Plan, in an amount to be determined at trial;

G.      awarding the Trust reasonable costs and expenses incurred in this proceeding, including attorneys' fees and expert fees;

H.      prejudgment and post-judgment interest; and

I.      granting such other and further relief as the Court deems just and proper.

Dated: August 16, 2024
      New York, New York

Respectfully submitted,

PALLAS PARTNERS (US) LLP

By: /s/ *Duane L. Loft*
Duane L. Loft
Shireen Barday
Anastasia Cembrovska
Ashley Mullen

75 Rockefeller Plaza
New York, NY 10019
Telephone: (212) 970-2300
Duane.Loft@pallasllp.com
Shireen.Barday@pallasllp.com
Anastasia.Cembrovska@pallasllp.com
Ashley.Mullen@pallasllp.com

*Attorneys for Plaintiff*