**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>ENDO INTERNATIONAL PLC, *et al.*,[1]<br><br>     Debtors. | Chapter 11<br><br>Case No. 22-22549 (DSJ) |
| MATTHEW DUNDON, TRUSTEE OF THE ENDO GUC TRUST,<br><br>     Plaintiff,<br><br>     v.<br><br>TPG CAPITAL, L.P., TPG GLOBAL, LLC, TPG VI MANAGEMENT, LLC, TPG PARTNERS VI, L.P., TPG BIOTECHNOLOGY PARTNERS IV, L.P., TPG ADVISORS V, INC., TPG ADVISORS VI, INC., TPG BIOTECHNOLOGY GENPAR IV, L.P., TPG GENPAR VI, L.P, TPG SKY L.P., TPG SKY CO-INVEST L.P., TPG BIOTECHNOLOGY PARTNERS IV L.P., PARK STREET INVESTORS L.P., PAUL VICTOR CAMPANELLI, THOMAS JOSEPH HAUGHEY, TERRANCE COUGHLIN, PATRICK LEPORE, BARRY J., GILMAN, JOSEPH A. BARBARITE, CHAD M. GASSERT, STEPHEN O. MONTALTO, ANTONIO PERA, MUTHUSAMY SHANMUGAM, STEPHEN CAREY, SUKETU P. SANGHVI, LAWRENCE MILTON BROWN, PHILLIP JOHN BRANCAZIO, DIANE MONTALTO, SHARAD MANSUKANI, KEITH A. KUCINSKI, MICHAEL J. ALTAMURO, MARTIN L. WILSON, KAREN A. O'CONNOR, JOHN L. AMERES, HYUN SOO HONG, ANH TRAN-CAO, and JOHN DOES 1-999,<br><br>     Defendants. | Adv. Pro. No. 24-7030 (DSJ) |

---

[1] The last four digits of Endo International plc's tax identification number are 3755. Due to the large number of debtors in the chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Endo.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

**APPEARANCES:**

**PALLAS PARTNERS (US) LLP**
*Counsel for Plaintiff Matthew Dundon, Trustee of the Endo GUC Trust*
75 Rockefeller Plaza
New York, NY 10019
By:   Duane L. Loft
        Anastasia Cembrovska
        John McAdams
        Jill Forester

**KIRKLAND & ELLIS LLP**
*Counsel for Defendants TPG Capital, L.P., TPG Global, LLC, TPG VI Management, LLC, TPG Partners VI, L.P., TPG Biotechnology Partners IV, L.P., TPG Advisors V, Inc., TPG Advisors VI, Inc., TPG Biotechnology GenPar IV, L.P., TPG GenPar VI, L.P., TPG Sky L.P., TPG Sky Co-Invest L.P., Park Street Investors L.P., and Sharad Mansukani*
601 Lexington Avenue
New York, NY 10022
By:   Josh Greenblatt, P.C.
        Jeffrey R. Goldfine
        Vanessa Di Feo
        Claire Fieldman (admission pending)

333 West Wolf Point Plaza
Chicago, IL 60654
By:   William E. Arnault, P.C. (*pro hac vice*)

**LATHAM & WATKINS LLP**
*Counsel for Defendants Paul V. Campanelli, Thomas J. Haughey, Terrance Coughlin, Patrick LePore, Barry J. Gilman, Joseph A. Barbarite, Chad M. Gassert, Stephen O. Montalto, Antonio Pera, Muthusamy Shanmugam, Stephen Carey, Suketu P. Sanghvi, Lawrence M. Brown, Phillip J. Brancazio, Diane Montalto, Keith A. Kucinski, Michael J. Altamuro, Martin L. Wilson, John L. Ameres, Hyun Soo Hong, and Anh Tran-Cao*
1271 Avenue of the Americas
New York, NY 10020
By:   James E. Brandt
        Jason C. Hegt
        Jooyoung Yeu
        Sarah R. Burack

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

2

## I.   INTRODUCTION

This decision concerns a lawsuit brought by the trustee (the "**Trustee**" or "**Plaintiff**") of a trust created for the benefit of opioid victims and other unsecured creditors of a large post-confirmation pharmaceutical company, Endo International plc and related entities ("**Endo**"). The lawsuit seeks to avoid Endo's payment of consideration as part of its multi-billion-dollar acquisition of an allegedly grossly overvalued generic pharmaceutical company called Par Pharmaceutical, Inc. ("**Par**"). The suit also seeks to hold the seller, the private equity firm TPG and affiliated entities, along with other defendants, responsible in contribution for a portion of the liability and costs that Endo incurred in connection with the opioid crisis.

The operative complaint asserts two types of claims: (1) claims for constructive fraudulent transfer for Endo's acquisition-associated payments made to the defendants, and (2) claims for contribution from the defendants for costs that Endo incurred in defending and settling opioid-related litigation, allegedly due to TPG's and other defendants' actionable acts and omissions during the pre-Endo-acquisition period when TPG owned and managed Par. Roughly speaking, the trustee contends that the purchase price Endo paid to acquire Par was so excessive that Endo did not obtain reasonably equivalent value and that Endo was insolvent or left with unreasonably small capital as a result of its acquisition of Par. An important pillar of this claim is the theory that Endo was insolvent and Par's value was overstated due to both companies' unacknowledged but massive accrued opioid liabilities. The Trustee further seeks contribution from all defendants for liabilities and costs Endo experienced following the transaction that flowed from the actions of defendants while they owned and managed Par.

The operative complaint names numerous defendants that generally fall into three categories: (1) TPG entities that sold Par to Endo and directly received payments and other

3

consideration from Endo in the acquisition (the "**TPG Transfer Defendants**"); (2) those entities together with additional TPG entities, against all of whom a contribution claim is asserted (the "**TPG Defendants**"), and (3) former officers and directors of Par who held unmatured options and other entitlements in Par and were paid in satisfaction of those entitlements in the transaction (the "**Individual Defendants**") (together with the other defendants, the "**Defendants**").

All defendants have moved to dismiss the case. As further detailed below, the Court denies the motion to dismiss the fraudulent transfer claim against the TPG Transfer Defendants. The complaint plausibly alleges that Endo did not receive reasonably equivalent value in acquiring Par, based on two main types of alleged facts: (1) the purchase price enormously exceeded contemporaneous valuations of Par, and (2) Endo's market capitalization declined by billions of dollars within a short period after the Par transaction was announced. Further, the complaint plausibly alleges that Endo was insolvent or left with unreasonably small capital after it acquired Par due mostly to large, accrued but unacknowledged opioid liabilities.

The complaint does not, however, plausibly allege a constructive fraudulent conveyance claim against the Individual Defendants. First, the Trustee fails to allege that the Individual Defendants were direct recipients of the transfers that they received, and for reasons detailed below, the facts alleged do not plausibly make the additional showing required of constructive fraudulent conveyance claims against subsequent transferees. Finally, the complaint's contribution claim is dismissed for its lack of factual support for any plausible inference that any particular defendant caused a discernible portion of the liabilities Endo eventually incurred due to opioid-related activities.

Thus, the Court (i) GRANTS the motions to dismiss the contribution claim against all Defendants, (ii) GRANTS dismissal of the constructive fraudulent transfer claim against the

4

Individual Defendants, and (iii) DENIES dismissal of the constructive fraudulent transfer claim against the TPG Transfer Defendants.

## II.   BACKGROUND

The complaint spans nearly 100 pages, and this decision does not restate it in full, instead providing a general overview and discussing specific facts as they are pertinent to the decision's analysis. The decision assumes as true and draws from facts alleged in the complaint, augmented at times by contracts that are referenced in or integral to the complaint.

### A.  The Parties

The plaintiff is Matthew Dundon, solely in his capacity as the trustee for the Endo General Unsecured Creditors' Trust (the "**Endo GUC Trust**"), acting on behalf of the trust and as successor-in-interest to the estates of the above-captioned debtors and debtors-in-possession. Amended Complaint ("**Complaint**" or "**AC**"), Dkt. No. 39 ¶ 21. Endo was a major pharmaceutical company with significant production and sales of opioid products, including Percocet and Opana. *Id.* ¶¶ 71-80, 96-99. Endo eventually incurred enormous defense costs and liabilities relating to its opioid products through governmental investigations and mass tort claims. *Id.* ¶¶ 241-248. Endo filed and confirmed a chapter 11 plan,[2] pursuant to which the Endo GUC Trust was created. The Endo GUC Trust's beneficiaries are certain of Endo's unsecured creditors, including, among others, thousands of women implanted with defective vaginal mesh products (another Endo product line that led to large-scale liabilities) and victims of the opioid crisis. *See id.* ¶ 21. Mr. Dundon has been charged with, among other things, pursuing litigation of estate claims for the benefit of Endo's unsecured creditors.

---

[2] *Fourth Amended Joint Chapter 11 Plan of Reorganization of Endo International plc and its Affiliated Debtors*, Case No. 22-22549 (JLG), Dkt No. 3849.

This decision does not describe each of the 36 defendants[3] in detail, but they fall into three categories: (1) the TPG Transfer Defendants,[4] which are four corporate entities that collectively constitute or are otherwise affiliated with the private equity firm known as TPG that were the sellers of Par to Endo, and which directly received the consideration that Endo paid for its acquisition of Par; (2) the TPG Defendants,[5] also comprised of a multitude of TPG-affiliated corporate entities, which include the TPG Transfer Defendants, against whom the claim for contribution is pled; and (3) the Individual Defendants,[6] consisting of various individuals who served as officers and directors at Par and received payment in connection with the acquisition in exchange for the cancellation of their unmatured, unexercised stock options and other entitlements in Par. *See id.* ¶¶ 23-61. The Complaint does not specify whether both counts are pled against every Defendant, but, at the Hearing, Plaintiff's counsel explained that Count I for constructive fraudulent transfer is asserted only against the Individual Defendants and the TPG Transfer Defendants. *See* Hearing Transcript, Dkt. No. 60, Pgs. 19-21, 67. Plaintiff's counsel also clarified that Count II seeking contribution is pled against every one of the Defendants and that Plaintiff reserves the right to pursue claims against additional subsequent transferees whose

---

[3] The TPG Defendants and the Individual Defendants are generally separately represented and filed independent motions to dismiss and replies. Throughout the opinion, the Court will reference the defendants in these groups generally. The Court will thus make a few notes so the record is clear: the TPG Defendants and Sharad Mansukani are both represented by Kirkland & Ellis LLP and filed the TPG MTD and TPG Reply (defined below); Sharad Mansukani joins in the arguments pled on behalf of the other Individual Defendants; and Karen A. O'Connor is proceeding *pro se* and has not joined in the pleadings filed by the Individual Defendants, but since the facts about her are not materially different from those against other Individual Defendants, the Court extends its holdings concerning those defendants to Ms. O'Connor as well. For the avoidance of confusion, "TPG Defendants" as defined in this decision does *not* include Sharad Mansukani.

[4] TPG Sky L.P.; TPG Sky Co-Invest L.P.; TPG Biotechnology Partners IV L.P.; and Park Street Investors L.P.

[5] In addition to the TPG Transfer Defendants listed in the above footnote, the TPG Defendants also include: TPG Capital, L.P.; TPG Global, LLC; TPG VI Management, LLC; TPG Partners VI, L.P.; TPG Biotechnology Partners IV, L.P.; TPG Advisors V, Inc.; TPG Advisors VI, Inc.; TPG Biotechnology GenPar IV, L.P.; and TPG GenPar VI, L.P.

[6] The Individual Defendants are as follows: Paul Victor Campanelli; Thomas Joseph Haughey; Terrance Coughlin; Patrick Lepore; Barry J. Gilman; Joseph A. Barbarite; Chad M. Gassert; Stephen O. Montalto; Antonio Pera; Muthusamy Shanmugam; Stephen Carey; Suketu P. Sanghvi; Lawrence Milton Brown; Phillip John Brancazio; Diane Montalto; Sharad Mansukani; Keith A. Kucinski; Michael J. Altamuro; Martin L. Wilson; Karen A. O'Connor; John L. Ameres; Hyun Soo Hong; and Anh Tran-Cao.

existence and identity are revealed during discovery through its inclusion of a group of "John Doe" defendants. *See id.*; AC ¶ 62.

### B. Factual Background

As of roughly two years before the Par transaction, Endo faced significant product liability arising from trans-vaginal mesh products as a result of its ill-fated acquisition of a medical devices company. *Id.* ¶ 74. Thereafter, Endo appointed a new Chief Executive Officer, Rajiv De Silva, who pursued a highly acquisitive strategy at the company. *Id.* ¶¶ 75-80. From February 2014 through the end of 2015, Endo completed at least 11 major transactions, including acquisitions, divestitures and licensing deals. *Id.* ¶ 80.

Founded in 1978, Par was a New Jersey-based manufacturer, distributor, and seller of generic pharmaceuticals. *Id.* ¶¶ 63-64. TPG acquired Par in September 2012 at an enterprise value of about $1.9 billion. *Id.* ¶¶ 65-67, 275; TPG Decl. Ex. 1 at 3. After TPG held the company for three years, in March 2015, Par filed a Form S-1 Registration Statement with the intention of taking the company public, which sparked Rajiv De Silva's interest. *Id.* ¶ 81. Endo considered Par a desirable acquisition target, believing that its growing generic opioid product business would complement Endo's current lucrative offerings and drive long-term cash flow and growth. *See* TPG Decl. Ex. 10.

TPG ultimately accepted Endo's offer to acquire Par for $8.05 billion. AC ¶ 85. Accordingly, Endo and Par entered into a merger agreement (the "**Merger Agreement**") and announced the acquisition (the "**Transaction**") in May 2015 with the transaction to be effectuated in September 2015. *Id.* ¶¶ 85, 87. In exchange for ownership of the entire capital structure of Par, Endo provided the following consideration: $4.1 billion in cash, 18.1 million shares of Endo stock (with a market valuation of about $1.3 billion at the time of the

announcement), the assumption of Par's debt of about $2.2 billion, and transaction costs of about $450 million. *Id.* ¶¶ 85, 87; *see also* Merger Agreement, TPG Decl. 4. Even if one excludes the value of the Endo stock component (given the Trustee's allegation that Endo was actually insolvent such that the stock's true value arguably was zero, and notwithstanding the lack of evidence that anyone at the time doubted Endo's valuation implied by the $8 billion sale price) and the transaction costs, the transaction implied a Par enterprise value of approximately $6.3 billion. AC ¶ 87.

Around the time of the Transaction, the public market valued Par at between $3 to $4 billion and Par's internal valuation valued the company at approximately $3.4 billion. *Id.* ¶¶ 82-83. From the date of the announcement of the deal in May to its completion in September, Endo lost nearly $3 billion in market capitalization and its share price dropped nearly 20%. *Id.* ¶ 86.

In the years following Endo's acquisition of Par, Endo faced over 3,500 complaints related to opioids and expended approximately $344 million defending against these lawsuits, until, on August 16, 2022, Endo filed for Chapter 11 protection. *Id.* ¶ 241. At the time of the Transaction, the potential harms of opioid abuse had been widely publicized, and Purdue Pharma had already settled investigations and other litigation surrounding the deceptive marketing and misbranding of its opioid pain relievers. *See id.* ¶¶ 191-214. Par is likewise alleged to have faced large, accrued opioid-related liabilities, exacerbating the liability Endo faced post-acquisition. *Id.*

The Complaint labels Endo as "acquisition hungry" yet "highly insolvent," and terms its purchase of Par a "fraudulent multi-billion dollar windfall that private equity giant TPG reaped." *Id.* ¶¶ 1, 2. The Complaint contends that Par was worth far less than the purchase price, assertedly evidenced by Par's or TPG's pre-sale hope to realize just $3.4 billion in sales proceeds, and by a $3 billion decline in Endo's market capitalization in the four months between

the Transaction's announcement and its completion. Disputing these assertions, Defendants

claim that "out-of-the-money unsecured creditors of Endo seeking to profit" from this action are

baselessly attacking Endo's arm's-length acquisition of Par from over a decade ago and pursuing

contribution for obligations that had "nothing to do with the defendants." TPG MTD (defined

below) at 5-6.

### C. Procedural Background

On August 16, 2024, the Trustee filed a complaint asserting four causes of action against

the Defendants. Dkt. No. 1. On November 15, 2024, the TPG Defendants and Sharad Mansukani

filed a motion to dismiss all four causes of action. Dkt. No. 28. On November 25, 2024, the

Individual Defendants excluding Mr. Mansukani and Ms. O'Connor moved to dismiss the first

count of the original complaint, which asserted a claim against them for constructive fraudulent

transfer. Dkt. No. 34.

Without those motions having been adjudicated but informed by the Defendants' motions

and associated contentions, on February 3, 2025, the Trustee filed an amended complaint (the

Complaint) that now asserted just two causes of action - one for constructive fraudulent transfer

and the other for contribution - and that omitted the other claims that had been alleged in the

initial complaint. On April 1, 2025, the TPG Defendants and Mr. Mansukani moved to dismiss

the Complaint (the "**TPG MTD**") [Dkt. No. 44], and the Individual Defendants, again exclusive

of Mr. Mansukani and Ms. O'Connor, filed their own motion to dismiss the Complaint (the

"**Individual MTD**") [Dkt. No. 45] in which they joined in the TPG MTD and made additional

arguments for dismissal that are unique to their claims. Both sets of Defendants submitted

declarations in support of their respective motions, attached to which were numerous documents,

including filings from Endo's bankruptcy case and various agreements referenced in the

9

Complaint. *See* TPG MTD, Ex. 2 ("**TPG Decl.**"); Dkt. No. 46 ("**Individual Decl.**"). The Trustee filed memoranda of law in opposition to the motions to dismiss. Dkt. Nos. 52 and 53 (respectively, the "**Individual Opposition**" and the "**TPG Opposition**"). The Defendants filed replies in further support of their motions to dismiss. Dkt. Nos. 54 and 55 (the "**TPG Reply**" and the "**Individual Reply**," respectively). On September 30, 2025, the Court heard oral argument (the "**Hearing**") and reserved decision.

### III.    JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a)-(c) and 1334(b), and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.). This adversary proceeding presents both "core" and "non-core" proceedings under 28 U.S.C. § 157(b)(2)(A) and (H). Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced under the Bankruptcy Code.

### IV.    LEGAL STANDARD

On a motion to dismiss, a court must assess the legal sufficiency of a complaint's allegations in light of the pleading requirements set forth in Rule 8 of the Federal Rules of Civil Procedure. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion, a plaintiff must show that the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts apply the "[t]wo working principles" articulated in *Iqbal* to evaluate a motion to dismiss. *In re Tops Holding II Corp.*, 646 B.R. 617, 646 (Bankr. S.D.N.Y. 2022) (quoting *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2012)).

First, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Rule 8's pleading standard does not necessitate detailed factual allegations, but "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. In evaluating factual sufficiency, the court must accept all factual allegations set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.*

Second, "only a complaint that states a *plausible* claim for relief survives a motion to dismiss." *Id.* at 679 (emphasis added). "To be plausible, the complaint need not show a probability of plaintiff's success, but it must evidence more than a mere possibility of a right to relief." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (internal citations omitted). "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012). Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

"Courts must consider the complaint in its entirety as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). In doing so, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as any documents "integral" to the complaint, *i.e.*, "where the complaint 'relies heavily upon [the document's] terms and effects.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (quoting *Int'l

*Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). Defendants filed

numerous documents in support of their respective motions, some of which are mentioned, cited,

or relied on by the Plaintiff in the Complaint, and others of which are docketed in Endo's main

Chapter 11 case. *See* TPG Decl.; Individual Decl.

## V.   DISCUSSION

### A.  Constructive Fraudulent Transfer

Count I of the Complaint seeks to avoid and recover a multitude of transfers associated

with the Transaction. The Trustee makes these claims pursuant to 11 U.S.C. §§ 544(b) and

550(a), "the UFTA, and/or other applicable law." AC ¶ 295. Section 544(b)(1) of the Bankruptcy

Code provides as follows:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any
> obligation incurred by the debtor that is voidable *under applicable law* by a
> creditor holding an unsecured claim that is allowable under section 502 of this
> title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1) (emphasis added). This provision permits a trustee to take advantage of

"applicable law," i.e., state statutes, to avoid fraudulent transfers for the benefit of the estate, or

as is the case here, the Endo GUC Trust. *See e.g., In re Fitzpatrick Container Co.*, 670 B.R. 425,

440 (Bankr. E.D. Pa. 2025). To the extent a transfer is avoidable, § 550(a) allows the Trustee to

recover the value of the avoided transfer from "the entity for whose benefit such transfer was

made," "the initial transferee," or "any immediate or mediate transferee of such initial

transferee," otherwise known as a "subsequent transferee." 11 U.S.C. § 550(a); *Feldman as Tr.*

*of Est. of Image Masters, Inc. v. SunTrust Bank*, No. 07-BK-21587, 2024 WL 4123779, at *15

(E.D. Pa. Sept. 6, 2024), *appeal dismissed sub nom. Image Masters Inc.*, No. 25-1597, 2025 WL

2771453, at *7 (3d Cir. Sept. 22, 2025). However, the trustee may not recover transfers from a

subsequent transferee that received the transfer "for value, including satisfaction or securing of a

12

present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer

avoided." 11 U.S.C. § 550(b)(1).

Although the Complaint does not specify which state's fraudulent transfer law applies to

any single Defendant,[7] the fraudulent transfer analysis in most states shares substantially similar

legal requirements to those set forth in § 548 of the Bankruptcy Code.[8] *Cf. In re Vivaro Corp.*,

524 B.R. 536, 550 (Bankr. S.D.N.Y. 2015) ("Courts use the term 'fair consideration'

interchangeably with 'reasonably equivalent value,' relevant in Bankruptcy Code section 548

fraudulent transfer claims, when examining constructive fraud claims."); 5 Lawrence P. King,

Collier on Bankruptcy, ¶ 548.01[4] (1999) ("Cases decided under the UFCA and UFTA are

considered to be persuasive authority for similar issues arising under section 548 of the Code").

To state a claim for constructive fraudulent transfer, a plaintiff must plausibly allege that (1) the

transferor made the transfer without receiving "reasonably equivalent value," and (2) the

transferor made the transfer under one of the following financial conditions: (i) when the debtor

was insolvent, (ii) when the transfer renders the debtor solvent, (iii) when the transfer leaves the

debtor with unreasonably small capital, or (iv) when the debtor intends or believes it will incur

debt beyond its ability to pay when such debts mature. 11 U.S.C § 548(a)(1)(B); *see also In re*

---

[7] Rule 8's general pleading standards do not require a plaintiff to provide statutory citations in cases where it is evident from the face of the complaint that defendants are on notice of the claims against them and the basis underlying such claims. *See e.g., In re Verestar, Inc.*, 343 B.R. 444, 470 (Bankr. S.D.N.Y. 2006) (denying a motion to dismiss a constructive fraudulent transfer claim on the grounds that complaints need not contain statutory citations to satisfy Rule 8); *In re Oakwood Homes Corp.*, 340 B.R. 510, 526 (Bankr. D. Del. 2006) ("Accordingly, to survive dismissal, the complaint need not identify a particular state's uniform fraudulent transfer law."). Here, Plaintiff includes sufficient details regarding the precise payments related to the Transaction sought to be avoided, and Defendants are on notice of the legal bases and theories asserted against them.

[8] States have each adopted a body of law governing fraudulent transactions, namely the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, or state-variances thereof. A central distinction between these laws is that the "reasonably equivalent value" inquiry in some states has an additional requirement of good faith, such that a Plaintiff need only allege a lack of reasonably equivalent value *or* bad faith. However, because Plaintiff has not alleged that Defendants acted in bad faith, Plaintiffs must plausibly allege that it did not receive reasonably equivalent value to succeed on its claim. As such, regardless of which state's laws are treated as the "applicable state law," the legal inquiry at this stage is substantially similar and Defendants have raised no arguments that depend on any distinctions between these state laws.

*Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005). This decision first discusses the fraudulent transfer claims against the TPG Transfer Defendants, and then considers the fraudulent transfer claims against the Individual Defendants.

> 1. The Complaint States a Claim for Constructive Fraudulent Transfer Against the TPG Transfer Defendants

> a. *Reasonably Equivalent Value*

Even though Defendants raise significant concerns could ultimately prevail on the fraudulent transfer claims, the Complaint contains sufficient factual allegations to plausibly allege that Endo did not receive reasonably equivalent value in exchange for Par.

To state a claim against the TPG Transfer Defendants, the Trustee must plausibly allege that Endo did not receive "reasonably equivalent value" in exchange for consideration that Endo paid to acquire Par. For purposes of the reasonably equivalent value analysis, Plaintiff ignores transaction costs and assumes the equity portion of the consideration that (the allegedly insolvent) Endo provided to have no value. *See* AC ¶ 1 n.2. As such, under Plaintiff's assumptions, the Transaction's terms reflect a Par enterprise value of $6.3 billion, with $4.1 billion of that amount constituting the transfers challenged as constructively fraudulent. *See id.* ¶ 87. Therefore, applying the Trustee's own theory of the case, the Trustee must state facts sufficient to support a plausible inference that the value Endo received was not "reasonably equivalent" to $6.3 billion.

The Bankruptcy Code does not define "reasonably equivalent value." *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535-36 (1994); *Mellon Bank, N.A. v. The Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.)*, 92 F.3d 139, 148 (3d Cir. 1996) ("Thus, Congress left to the courts the obligation of marking the scope and meaning of reasonably equivalent value.") (internal quotation marks and citations omitted). However, the Code does

14

define "value" for purposes of fraudulent transfer analyses as the "property, or satisfaction or securing of a present or antecedent debt of the debtor, but [value] does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). Considering the Code's definition of "value" and the absence of a statutory definition for "reasonably equivalent value," courts have divided the inquiry into two considerations: (1) whether the transferor received *any value at all* from the challenged transaction, and (2) whether the value received was *reasonably equivalent* or approximately equal to the value the transferor gave. *See R.M.L., Inc.*, 92 F.3d at 148-49; *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 802-03 (Bankr. S.D.N.Y. 2005).

The question of reasonable equivalence is not one of mathematical precision—the value received by the debtor need not be a "penny for penny exchange" and may be "roughly" comparable to the value given, but the value received is presumptively incommensurate if it is "so low that it shocks the conscience." *Pereira v. Wells Fargo Bank, N.A.* (*In re Gonzalez*), 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006). In evaluating reasonably equivalent value, courts consider both the direct and indirect benefits flowing to the debtor to determine the relative comparability of the consideration exchanged between the transacting parties. *See In re Actrade Fin. Techs. Ltd.*, 337 B.R. at 803-04; *Rubin v. Mfrs. Hanover Trust Co.,* 661 F.2d 979, 991-92 (2d Cir. 1981). In doing so, courts examine the totality of circumstances of the transaction, including "(i) the fair market value of the economic benefit received by the debtor; (ii) the arms-length nature of the transaction; and (iii) the good faith of the transferee." *R.M.L., Inc.*, 92 F.3d at 149; *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 381 (Bankr. S.D.N.Y. 2013*Sec.* ). Although courts have dismissed fraudulent transfer claims where the complaint does not plausibly allege an absence of reasonably equivalent value, *see, e.g.*, *In re Trib. Co. Fraudulent*

15

*Conv. Litig.*, 10 F.4th 147, 172-73 (2d Cir. 2021), the inquiry is inherently fact driven. *See, e.g.,*

*Tronox*, 429 B.R. 73, 97 (Bankr. S.D.N.Y. 2010).

Here, the Complaint's voluminous allegations distill to a few key points supporting the

contention that Endo did not receive reasonably equivalent value: (1) Par's actual liabilities were

far higher than Endo recognized at the time of the Transaction because Par had enormous

undisclosed, unaccounted-for opioid liabilities; (2) Par's actual enterprise value was lower than

that implied by the Transaction; and, as argued in the TPG Opposition; and (3) the Transaction

was not conducted at arm's length as Endo conducted "paltry" due diligence, Endo did not have

"equal knowledge" about Par as did the seller TPG, and Endo failed to access all available

information related to the Transaction. TPG Opposition at 38, 36-46; *see* AC ¶¶ 184-235. Among

the facts alleged in support of the contention that Endo egregiously overpaid for Par are: (a) Par's

own internal projections and valuation put its enterprise value at $3 billion to $4 billion; (b)

Endo's market capitalization decreased at least $3 billion between the announcement and closing

of the acquisition some months later, thus assertedly confirming that Endo grossly overpaid for

Par; and (c) Par had a system designed to disclose suspicious orders of controlled substances that

was, at least at one point, noncompliant with regulations that in addition to Par's sales of opioids,

which allegedly caused the company to be saddled with accrued and knowable but unrecognized

opioid liabilities that were not taken into account in the purchase price. *See* AC ¶¶ 184-235.

In support of dismissal, the TPG Transfer Defendants argue the facial implausibility that

Par's liabilities were greater than recorded at the time of the Transaction. *See* TPG MTD ¶¶ 39-

42. The TPG Transfer Defendants also maintain that the Trustee has not plausibly alleged an

absence of reasonably equivalent value because the Par acquisition was an arm's length

transaction, and arm's length agreements presumptively establish the contemporaneous value of

16

the assets acquired, while no factual allegations support a plausible inference that the transaction

should not be accorded deference. *See id.*

First, as described further below, the arm's length nature of the transaction is not

dispositive here, even though facts that can be appropriately considered on this motion leave no

doubt that the Transaction was negotiated at arm's length between sophisticated parties that were

advised by highly qualified and experienced financial and legal professionals. Further, no fact

has been alleged supporting an inference of bad faith on the part of any transaction participant.

The identity of Endo's counsel appears on the Merger Agreement itself, which is

incorporated into the Complaint by reference, and Endo's public SEC filings related to the

Transaction also identify Endo's professionals and can properly be the subject of judicial notice.

*See* Merger Agreement at Pg. 82; *see also, e.g.,* Form 8k filed by Endo International Plc on

September 28, 2015, Exhibit 99.1 at 2 ("Barclays, Deutsche Bank, and Houlihan Lokey acted as

financial advisors to Endo. JP Morgan acted as financial advisor to Par and its shareholders.

Skadden, Arps, Slate, Meagher & Flom, LLP were Endo's legal advisors and Ropes & Gray,

LLP acted as legal advisors to Par and its shareholders."). Plaintiff's suggestion that this reality

cannot be resolved at this threshold stage of the case is an unwarranted request that the Court

"disregard" facts that are abundantly evident in the public record and whose accuracy cannot be

reasonably questioned in addition to documents integral to the Complaint. *See Kramer v. Time

Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (a court may take judicial notice of the contents of

SEC filings). Meanwhile, the Complaint is devoid of factual allegations that would lead this

Court to infer that the Transaction was not conducted at arm's length, a fact that Plaintiff's

counsel conceded at the Hearing. Hearing Transcript, Dkt. No. 60, Pg. 75 ("THE COURT: Okay.

17

So there's no allegation of collusion or non-arm's length negotiation, is there? Or is there? In the Endo-Par transaction. MS. FORSTER: I don't believe so.").

Arm's-length transactions are transactions "between two unrelated and unaffiliated parties" or "between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflicts of interest arise." *In re Bruno Mach. Corp.*, 435 B.R. 819, 834 (Bankr. N.D.N.Y. 2010) (quoting Black's Law Dictionary 1635 (9th ed. 2009)). Courts have consistently found that the price achieved through an arm's length transaction between informed and sophisticated parties should be afforded deference as it represents the best evidence of fair market value. *See In re Morris Commc'ns NC, Inc.,* 914 F.2d 458, 467 (4th Cir. 1990) (noting that whether the sale was "an arms length transaction between a willing buyer and a willing seller" is a factor of "considerable importance") (internal citation omitted); *Peltz v. Hatten*, 279 B.R. 710, 737-38 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003); *see also VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (noting that absent some reason to mistrust it, a stock's market price is "a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses") (quoting *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996)); *In re Vivaro Corp.*, 524 B.R. at 556 (dismissing a fraudulent transfer claim as inadequately pled when, among other reasons, the plaintiff failed to "rebut the presumption that the Acquisition was negotiated at arm's length . . . because the Complaint is devoid of allegations regarding the negotiations that led to the Acquisition"). Courts thus are reluctant to subject these sorts of transactions to fraudulent conveyance liability, especially considering that "[w]hen sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent

18

transfer law to reevaluate or question those transactions with the benefit of hindsight." *Peltz*, 279 B.R. at 738; *see also* Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law,* 8 Bankr. Dev. J. 55, 82-86 (1991) ("[The] concept [of reasonably equivalent value] recognizes that the buyer can get a good deal, even a great deal, but not an obscene deal at the expense of the debtor's creditors, that is, when the debtor is insolvent. The functional approach to reasonably equivalent value recognizes that the purpose of fraudulent transfer law is not to allow the debtor to re-trade a transaction struck in good faith and arrived at by arm's length negotiations. Such a transfer should not be a viable target of fraudulent transfer law."); *Morris Commc'ns NC, Inc.,* 914 F.2d at 473 (reversing holding that a transfer was constructively fraudulent when that court improperly dismissed the evidentiary value of the transaction price "arrived at after full and fair arm's length negotiations" because opinion testimony showed that at the time, valuing the property was largely guesswork).

Accordingly, transacting counterparties acting in good faith and conducting appropriate due diligence could assign a wide range of values to a business and the agreed-upon price should not be "set aside as a fraudulent conveyance when some assumption [a party] made in that fashion proves wrong." *In re Greater Se. Cmty. Hosp. Corp. I*, No. 02-02250, 2012 WL 589269, at \*14 (Bankr. D.D.C. Feb. 22, 2012), *aff'd sub nom. Alberts v. HCA, Inc.*, 496 B.R. 1 (D.D.C. 2013). As such, neither subsequent depreciation in nor appreciation in value of the consideration affects the question whether reasonable equivalent value was given as value is determined from the time of the transfer was made. *See Morris Commc'ns NC, Inc.*, 914 F.2d at 475 ("Because the stock later appreciated substantially is no ground for invalidating the sale. The critical time for judging the propriety of the sale was the time of the sale . . . ."); 5 Collier on Bankruptcy ¶ 548.09 (15th ed. 1984).

In the TPG Opposition, the Trustee attempted to recast the Transaction as not having been conducted at arm's length, arguing that the mere two months that elapsed between Par's IPO filing and Endo's announcement to acquire Par shows that Endo performed "paltry" and "dubious" due diligence, and that Par's failure to disclose its alleged opioid liabilities or provide its internal valuation to Endo created informational inequality such that the agreed-upon price should not be given deference. *See* TPG Opposition at 38-39 (citing AC ¶¶ 80 (the "breakneck pace of [Endo's] M&A [process] . . . raises questions about what type of diligence the company was, or could have been doing"), 81, 85). The Trustee's cited case law presents extreme circumstances in which it would make sense for a court to accord little weight to the apparent arm's length nature of the transaction. *See* TPG Opposition at 38-40. For example, the transacting counterparty in *A. Tarricone, Inc.* was a long-time golfing buddy of the debtor who loaned the money based on their friendship and admitted to conducting no due diligence into indicia of creditworthiness or the borrowing capacity of the debtor. *In re A. Tarricone, Inc.*, 286 B.R. 256, 269-70 (Bankr. S.D.N.Y. 2002). Similarly, *In re Bruno Mach. Corp.* involved a "close personal friend[]" of the debtor who conducted little to no due diligence and transferred sums via personal check to the debtor pursuant to oral agreements. 435 B.R. at 834. In the *Walro v. Hatfield* case, the transacting counterparty failed to do even the most "standard aspects of due diligence" such as obtaining an appraisal when buying property for the first time because he did business "on a handshake." 2017 WL 2772335, at *11, *7. Lastly, the *Adler* court found that a transaction that was allegedly the product of market manipulation and securities fraud should not be considered at arm's length. *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 109 (Bankr. S.D.N.Y. 1999), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001). All these cases involve circumstances that raise suspicions regarding the inherent fairness and commercial reasonableness of the

20

transaction. *See In re Garcia*, 494 B.R. 799, 809 (Bankr. E.D.N.Y. 2013) (Constructive fraudulent transfer law is designed to deprive the counterparty of the benefit of a transaction that was "the result of an intentional fraud or a constructive fraud resulting from a wrongful or unwarranted participation on the part of the Debtor, whether by omission or commission.").

The Trustee's contention that Endo performed such "paltry" due diligence that the Transaction should not be considered to have been done at arm's length is implausible and unsupported by the facts alleged or the case law the Trustee cites. It is unrealistic and not required that the parties to an arm's-length transaction must have "equal knowledge," and a seller's nondisclosure of its pre-sale internal valuation analysis has not been recognized as an indicator of a non-arm's-length transaction; the Trustee has identified no law saying that sellers are not entitled to maintain confidentiality of their internal evaluations or analyses. The idea that Endo's sophisticated legal and financial advisors failed to "assess[] all available information" by neglecting to account for information that was publicly available or computable using Par's basic financial information is equally implausible. TPG Opposition at 39. Unsubstantiated speculation about the sale process is conclusory and insufficient to plausibly allege that the process was tainted or unfair. *See In re Waterford Wedgwood USA, Inc.*, 500 B.R. at 382 (plaintiff's "musings about the sale process," including arguing that the process "may not have been the sort of orderly, systematic process that would result in a market-driven maximized price," was unsubstantiated speculation). The Trustee's conclusory aspersions fail to overcome the arm's length nature of the Transaction and the deference that courts give the price achieved in those circumstances.

Nevertheless, the arm's length nature of the Transaction is not alone dispositive on the question of reasonably equivalent value, as the applicable test requires assessing the "totality of

21

circumstances." *See In re MDIP Inc.*, 332 B.R. 129, 133 (Bankr. D. Del. 2005) (noting that the arm's length nature of a transaction is a "considerable factor", but all aspects of the transaction should be examined to evaluate the benefits received by plaintiff); *R.M.L.,* 92 F.3d at 148-54 (finding a lack of reasonably equivalent value in the exchange despite transferee's good faith and the arm's length nature of the transaction); *In re Crown Unlimited Mach., Inc.*, No. 03-13400, 2006 WL 6401548, at \*8 (Bankr. N.D. Ind. Oct. 13, 2006), *aff'd sub nom. Boyer v. Crown Stock Distribution, Inc.*, No. 04-0185, 2009 WL 418275 (N.D. Ind. Feb. 17, 2009), *aff'd in part, rev'd in part,* 587 F.3d 787 (7th Cir. 2009) (stating that no single factor alone results in the conclusion that reasonably equivalent value was given). The arm's length nature of the transaction is but one of three factors that the Court must consider in addition to factual issues raised in the complaint that might lead to the inference that reasonably equivalent value was not provided in a transaction. *See MDIP Inc.*, 332 B.R. at 133. Here, the trustee plausibly raises issues relating to disclosures and potential liabilities.

The Complaint contains a barrage of factual allegations, some combination of which suffices to plausibly allege that Endo did not receive "reasonably equivalent value" for the consideration it paid in acquiring Par. Among these allegations are that: public sources and Par own's internal valuation estimated that Par's value was somewhere between $3 billion and $4 billion; Endo suffered a $3 billion decline in its market capitalization over a short period that began when it announced the Transaction, assertedly reflecting the market's sense that Endo drastically overpaid for Par; the transaction multiple achieved is substantially above trading and transaction comparables; and Par's estimated opioid liabilities (which allegedly had already accrued, allegedly would inevitably become collectible, and allegedly were not taken into account in the transaction price) caused the company to be worth far less than the transaction

22

price. *See* AC ¶¶ 184-235. For at least this mixture of reasons, the Complaint alleges facts that permit a plausible inference that Endo did not receive "reasonably equivalent value" for the consideration it paid in the Transaction, notwithstanding that the sale was conducted at arm's-length.

The TPG Transfer Defendants' arguments to the contrary, although phrased as attacks on the plausibility of the many facts and contentions that the Complaint advances, really amount to disputing what inferences fairly flow from the facts alleged – not properly a reason to grant a motion to dismiss. The TPG Transfer Defendants argue, for example, that arm's length transactions between sophisticated parties are not to be set aside lightly in fraudulent conveyance actions, and that such transactions often if not always constitute strong evidence of the true market value of the assets conveyed at the time of the transaction. *See* TPG MTD at 40-42. The Court agrees, but the TPG Transfer Defendants overstate the conclusiveness of this factor on the motion. The TPG Transfer Defendants' cited case law concerning arm's-length transactions consists nearly entirely of summary judgment and post-trial decisions, not decisions on motions to dismiss. Again, arm's length is one of three factors – not alone dispositive.

Viewing the Plaintiff's allegations as true and considering the totality of circumstances, these figures suggest that the stated transaction price was higher, by some measures double, than the value received by Endo. A reasonable fact finder who credited that factual contention could conclude that Endo did not receive reasonably equivalent value. To be sure, there are facts present that could also lead to the plausible inference that Endo did receive reasonably equivalent value for its Transfers, but on a motion to dismiss the complaint survives even if the possibility of a viable claim falls above mere speculation but short of probable. *See Anderson News, L.L.C.*, 680 F.3d at 182-84. Here, the Trustee has done enough.

23

b. *Insolvency*

In addition to alleging an absence of reasonably equivalent value, the Trustee must plausibly allege that the debtor was insolvent at the time of, or as a result of, the transaction or was left with unreasonably small capital after the transaction. *See* 11 U.S.C § 548(a)(1)(B); *Sharp Int'l Corp.*, 403 F.3d at 53. A debtor's insolvency at the time of the transaction is determined through a "balance sheet test" which analyzes the debtor's book value, *i.e.*, the comparison of the sum of the debtor's assets to its liabilities at fair valuation. *See Tronox Inc. v. Kerr McGee Corp.* (*In re Tronox Inc.*), 503 B.R. 239, 296 (Bankr. S.D.N.Y. 2013) ("The analysis of solvency for fraudulent conveyance purposes is a 'balance sheet test,' examining whether debts in the aggregate are greater than assets in the aggregate."). The capital adequacy financial condition test considers whether the transaction left the debtor unable to pay its obligations as they became due, which extends to "financial difficulties short of equitable insolvency." *In re Lyondell Chem. Co.*, 567 B.R. 55, 109 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) (internal citation omitted). "The operative reference point for determining insolvency is the time at which the transfer took place." *In re Trinsum Grp., Inc.*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011).

Courts recognize that "insolvency is ordinarily a question of fact." *Tops Holding II Corp.*, 646 B.R. at 658 (quoting *Tronox Inc.*, 429 B.R. at 98). The calculation of insolvency often necessitates expert testimony as to the value of assets and liabilities, requiring the court to engage in the technical exercise of weighing the evidence. *Id.* Considering the fact-intensive nature of the insolvency analysis, courts should not dismiss a complaint that contains sufficient facts to permit a plausible inference of insolvency even if the defendant has its own plausible or even more probable allegations for solvency. *Id.* The complaint cannot "simply parrot[]" the

24

applicable statute, but a complaint may survive dismissal even if it does not include balance sheet specifics or other specific financial information so long as the face of the complaint allows the court to draw a reasonable inference of insolvency. *Id.* at 658-59.

The crux of the parties' dispute as to Endo's solvency is whether Endo's allegedly already-accrued, huge, and inevitable opioid liabilities should be considered even though those liabilities have not been alleged to have been reflected on Endo's contemporaneous financials, SEC filings, or anywhere else. The Complaint contains a dense array of factual allegations to show that Endo was insolvent at the time of the transaction, including that Endo overstated its assets while not reporting or underreporting substantial liabilities, such as opioid, trans-vaginal mesh, and tax liabilities. *See* AC ¶¶ 88-183. The Trustee's theory is that Endo was saddled with accrued, yet-to-be-recognized and highly probable opioid liabilities that exceeded Endo's assets at the time of the Transaction. If this Court were disinclined to view these liabilities as accrued and treat them as contingent and subject to a discount factor, the Trustee alternatively maintains that these liabilities were knowable and highly probable and still rendered Endo balance sheet insolvent even after probability discounting, and that Endo's insolvency became even more pronounced because of the Transaction since Par's value was also overstated due to Par's own unaccounted-for opioid liabilities. The Trustee backs these contentions by pointing to Endo's financial results after the Transaction, noting that "Endo did not generate positive pre-tax income in *any* fiscal year before bankruptcy, posting $9.6 billion of cumulative pre-tax losses." *Id.* ¶ 11. Taking all these factors into account, the Trustee argues that the Complaint plausibly raises factual issues related to the calculation of insolvency that cannot be decided on a motion to dismiss. *See* TPG Opposition at 29 (citing *Tronox Inc.*, 429 B.R. at 91 ("It is . . . quite irrelevant

25

whether Defendants' scenario has greater plausibility . . . The relative strength of the parties'
explanations is not a question to be decided at the pleading stage.")).

In opposition, the TPG Transfer Defendants[9] attack the Complaint's voluminous
contentions as a "kitchen sink" compilation of baseless speculations that fails to support the
Trustee's claims. Defendants object that the Complaint impermissibly relies on "hindsight-
based" contentions grounded upon adverse economic developments that did not occur until well
after the Transaction. Defendants emphasize that insolvency should be determined "based upon
information known or knowable as of the date of the challenged transfer," and that the opioid-
related settlements and lawsuits Endo enumerates did not ensue until years after the Transaction,
making such liabilities far too speculative for consideration in the insolvency analysis. TPG
MTD at 24 (quoting *In re Heritage Org.*, 375 B.R. 230, 284 (Bankr. N.D. Tex. 2007)).
Defendants further contend that the Trustee's assertions of understated liabilities, overstated
assets, and other adjustments to Endo's balance sheet all impermissibly constitute "hindsight" to
recast the reasonable and far more optimistic assumptions and expectations that existed at the
time of the Transaction. *See id.* at 16-29. Defendants also criticize the Trustee's valuation
methodologies as facially unreliable and unsupported by factual allegations. *See id.* at 29-35.
Lastly, Defendants question the overall plausibility of Endo's insolvency, underscoring Endo's
financial health before the Transaction, evidenced by the fact that Endo did not file for
bankruptcy until 7 years later and that debt markets were willing to loan Endo $6.5 billion to
finance the Transaction. *See* TPG MTD at 37-39.

Although courts cannot presume insolvency from a subsequent insolvency or use other
impermissible hindsight, courts may consider information "originating subsequent to the transfer

---

[9] The Individual Defendants join in the insolvency arguments in the TPG MTD. *See* Individual MTD at 1 n.1.

date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date, which assures that the valuation is based in reality." *In re Adelphia Commc'ns Corp.*, 512 B.R. 447, 495 (Bankr. S.D.N.Y. 2014) (internal citations and quotations omitted) (subsequent discovery of fraud can be appropriately considered when determining the real financial condition of the debtor at the time of the transfer). Contingent liabilities are appropriate to consider in an insolvency analysis, but such liabilities must be capable of reasonable estimation and must be discounted by the probability that they will arise. *In re Xonics Photochem., Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) ("To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real."); *In re W.R. Grace & Co.*, 281 B.R. 852, 858 (Bankr. D. Del. 2002) ("It is plain . . . that the appropriate discount factor is derived from the reasonable foreseeability (as of the transfer date) of the contingency coming to pass.").

Viewing the allegations in the light most favorable to the Trustee, the Court concludes that the Trustee has alleged sufficient facts to support the plausible inference that Endo was insolvent at the time of the Transaction, or was rendered insolvent because of the Transaction, due to due a number of reasons, including Endo's overpayment for Par and Endo's potential opioid-related and other liabilities that may have accrued resulting in an artificially inflated value for Endo based on its reported financials. First, the Complaint has sufficiently alleged that Endo may have been exposed to such massive liabilities and associated costs that Endo was insolvent at the time even if such liabilities are probability discounted. *See, e.g.*, *In re Amcad Holdings, LLC*, 579 B.R. 33, 39-40 (Bankr. D. Del. 2017) (trustee adequately pled insolvency when the complaint alleged "large payments and payouts" led to insolvency, and no "specific financial information" was provided). Contrary to the TPG Transfer Defendants' assertions, it is

permissible to consider contingent liabilities in a solvency analysis, such as liability arising from litigation and regulatory lawsuits, when the liabilities are capable of reasonable estimation. *See, e.g., Xonics Photochem., Inc.*, 841 F.2d at 200.

Second, the Complaint plausibly alleges that the Transaction occurred when at least the dangers and potential liabilities associated with the sale of opioids were widely known, such that Endo's subsequent litigation and settlements of these claims could have been foreseeable to the extent that it should be considered in Endo's insolvency analysis. *See* AC ¶ 160-79. As noted, insolvency is measured from the point at which the transfers occurred and cannot be presumed from a later insolvency, but it is appropriate to consider information originating subsequent to the transfer date if it sheds light on the on an accurate and realistic valuation of the company on the pertinent date. *See Adelphia*, 512 B.R. at 495. For example, the court in *Coated Sales* stated that courts are permitted to use "hindsight" to superimpose "current circumstances" onto "a previous set of circumstances," when subsequent fraud has been discovered. *In re Coated Sales, Inc.*, 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992). In that case, the court considered the post-transaction discovery of false accounts, phantom inventory, and illegal transfers to determine the debtor's actual financial condition at the date of the transfers at issue. *Id.* at 667-68. Although fraudulent circumstances are not alleged here, the salient similarity of the circumstances here to *Coated Sales* is that an unacknowledged problem – here, the large-scale generation of liability through reckless opioid sales practices, and in *Coated Sales*, fraud – allegedly caused a company to underreport or fail to acknowledge liabilities in a way that led to an exaggerated perception of the company's financial state. *See id.* Thus, the circumstances here are not unlike *Coated Sales*, and the Court may consider the fact that Endo's asset valuation could have been lower than reported due to the underreported liabilities. To the extent the Court must fix a value on

contingent liabilities, fact-finding is necessary to determine the appropriate discount rate and precise timing of these liabilities as compared to Endo's asset values at the time of the Transaction. *See Tronox Inc. v. Kerr McGee*, 503 B.R. at 312-14 (weighing competing expert testimony to determine an appropriate discount factor); *In re Wonderwork Inc.*, 611 B.R. 169, 211 (Bankr. S.D.N.Y. 2020) ("The amount of any discount, and hence, the question of solvency, presents an issue for trial."). That cannot be done at the present stage of this litigation.

The passage of time between the Transaction and Endo's eventual liability and bankruptcy may eventually prove decisive in the Defendants' favor, but the Court cannot rule for those defendants as a matter of law based on the pleadings. It is true that Endo filed for bankruptcy seven years after the Transaction, reportedly for a "confluence of factors" principal of which are the "downward pressure" from later-materialized liabilities, "slower than expected growth . . . due to, among other factors, the COVID-19 pandemic," increased generic competition from the termination of a patent, and opioid litigation costs. *Declaration of Mark Bradley in Support of Chapter 11 Petitions and First Day Papers*, TPG Decl., Ex. 3 at ¶ 39. The Court recognizes that a "powerful indication of contemporary, informed opinion as to value" comes from buyers or investors who with their finances at stake and with access to substantial professional expertise conclude that the business was one that could be profitably pursued at the time. *In re Iridium Operating LLC*, 373 B.R. 283, 348 (Bankr. S.D.N.Y. 2007) (internal citations omitted). Even so, these considerations do not warrant dismissal now; indeed, market participants could have been erroneously overvaluing the company due to their failure to consider liabilities or risks that were unrecognized by the market. *See Lyondell Chem. Co.*, 567 B.R. at 134-42.

Further, while Defendants make the appealing argument that Endo's "objective evidence from the public equity and debt markets" at the time of the Transaction should be accorded great weight, the cases on which Defendants rely involved post-trial findings of fact after in-depth review of competing expert reports and other evidence presented. *See* TPG MTD at 38 (citing *Iridium Operating LLC*; *VFB LLC v. Campbell Soup Co.*; and *Lyondell Chem. Co.*). The case law confirms that different outcomes are possible and that the case should proceed at this stage. For example, *Lyondell* explained that, much like the *Iridium* case, market valuations and debtor's relative ease of raising debt should be accorded great evidentiary weight in the solvency analysis because the company's financials were subject to legitimate assessment and tracking by financial institutions for reasonableness. 567 B.R. at 138-42. Yet, *Tronox Inc. V. Kerr McGee* gave little weight to the debtor's market valuations because the company's financials were not independently evaluated by third parties and failed to account for large tort and environmental liabilities, ultimately resulting in a gross overvaluation of the company. 503 B.R. at 298-314. *Tronox* shows that Endo's ability to raise debt does not necessarily preclude an insolvency finding as the financial markets allegedly failed to factor in enormous unrecognized opioid liabilities. *See id.*; *see also Tops Holdings II Corp.*, 646 B.R. at 672 ("the rationale for, and information supporting, the hundreds of millions of dollars of loans to Tops during the period at issue cannot at this stage render the Complaint's constructive fraudulent transfer allegations implausible").

Defendants also cannot overcome the reality that the Complaint includes concrete factual allegations regarding the magnitude of Endo's opioid liabilities, not mere conclusory assertions. The Complaint provides a detailed explanation of the estimated size of Endo's opioid liabilities and why liabilities of that size rendered Endo insolvent. Defendants' reliance on *F-squared* to

30

argue that the Trustee's pleading is deficient fails because the pleadings in the two cases differ; the *F-Squared* plaintiff was found wanting because the pleading's "use[] of words such as 'massive' and 'enormous' to describe a company's liabilities [were] conclusory in nature and [said] nothing regarding the actual magnitude of the liabilities much less the magnitude relative to the company's assets," whereas here, the Trustee has provided several valuation methodologies supported by financial metrics and other factual allegations. *In re F-Squared Inv. Mgmt., LLC*, 2019 WL 4261168, at \*12 (Bankr. D. Del. Sept. 6, 2019).

The Court does view some of the Complaint's insolvency theories as questionable and potentially impermissibly speculative. Among other criticisms, the Trustee's methodologies – particularly his so-called "Top-Down" Method – rely on small sample sizes and do not provide compelling support for the choice of samples or the assignment of Endo's share of liability. The asserted "Top-Down" Method strikes the Court as speculatively positing that Endo was insolvent based on a multiplication of Endo's percentage share of the opioid market multiplied by the asserted total societal or economic impact of opioid use, resulting in an assertion of over $35 million in Endo opioid liabilities. *See* AC ¶¶ 101-04. However, the Complaint includes other less speculative reasons to support an assertion of insolvency, and the Trustee need only demonstrate the possibility of insolvency, not its probability. *Twombly*, 550 U.S. at 556. Taken as a whole, the Complaint includes sufficient allegations of fact to support a plausible inference – which is well short of a firm conclusion – that Endo was insolvent at the time of the Transaction, in part due to Endo's accrued or contingent but unacknowledged opioid liabilities. *See* AC ¶¶ 89-130. Overall, using a variety of methodologies not all of which are speculative, Plaintiff contends that the fair value of Endo's accrued liabilities ranged somewhere between $7.5 and $32.9 billion, while the value of Endo's assets was less than $6.2 billion, resulting in balance sheet insolvency.

31

*See id.* ¶ 149. Taking the Complaint's factual assertions and assumptions as true, it is conceivable that Endo's liabilities could have exceeded its assets at the time of or as a result of the Transaction. Thus, the Complaint adequately supports its insolvency claim.

Granting the motion to dismiss considering the facts alleged would necessitate impermissibly failing to draw plausible inferences in the Trustee's favor, while making plausible but not inescapable inferences in the Defendants' favor. *See Tronox Inc.*, 429 B.R. at 91 ("It is also quite irrelevant whether Defendants' [solvency] scenario has 'greater plausibility,' as Defendant assert. For pleading purposes, a defendant's rebuttal of a plaintiff's contentions with its own does not entitle the defendant to dismissal of an action."). Thus, the Trustee has plausibly alleged that Endo was insolvent at the time of or because of the Transaction and the motion to dismiss the Complaint on this basis is denied.

2. The Complaint Fails to State a Claim for Constructive Fraudulent Transfer Against the Individual Defendants

To recap, to state a claim for constructive fraudulent transfer, a plaintiff must plausibly allege that (1) the transferor made the transfer without receiving "reasonably equivalent value," and (2) the debtor was insolvent at the time of, or as a result of, the transaction. *See Sharp Int'l Corp.*, 403 F.3d at 53. Assessing constructive fraudulent conveyance claims also requires determining whether the defendant from whom the plaintiff seeks to recover funds was a "direct transferee" or a "subsequent transferee" of the funds at issue. Whereas a plaintiff may recover from a direct transferee by establishing merely the two elements cited above, a plaintiff "may not recover" from a subsequent transferee "that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. §§ 550(a)(1), (a)(2), (b); s*ee In re ONH AFC CS Invs., LLC*, No. 23-

32

10931 (CTG), 2026 WL 312892, at *8-9 (Bankr. D. Del. Feb. 4, 2026) (a complaint that fails to plead the avoidability of the initial transfer is deficient).

For the reasons that follow, the facts alleged in the Complaint and other facts properly considered in resolving the motions to dismiss, such as the governing contract, establish that the Individual Defendants were not direct or immediate transferees, but rather subsequent transferees. Further, Plaintiff has not alleged and cannot plausibly allege that he is entitled to recover under the standards that govern claims against subsequent transferees.

The Individual Defendants all held stock and option entitlements against Par at the time of Endo's acquisition of Par, and there is no allegation that Endo owed anything else to any of the Individual Defendants prior to the Transaction. The Individual Defendants are alleged to have received payments related to the Transaction, and the Trustee contends these were constructive fraudulent transfers. The Complaint alleges generally that Endo was the direct or substantively direct transferor of the payments that the Individual Defendants received, but that assertion is a contested legal characterization that requires close review of the facts alleged against a well-developed body of law, discussed below.[10]

Defendants point to explicit language in the Merger Agreement[11] charging Par, and thus not Endo, with taking the steps necessary to ensure that payments were made to the individuals

---

[10] The Complaint most naturally reads as characterizing the Individual Defendants as initial transferees of Endo's transaction payments, with Par at most serving as a "mere conduit," which was confirmed by Plaintiff's counsel at the Hearing. See Hearing Transcript, Dkt. No. 60, Pgs. 71-74. The Complaint refers to each of the Individual Defendants as having "received cash consideration directly from, or as a subsequent transferee of, Endo," but, as discussed below, the Trustee primarily if not exclusively relies on arguments that depend on the Individual Defendants being direct recipients of payments by Endo. See AC ¶¶ 39-61, 288 ("[t]he Debtors made the Voidable Transfers to or for the benefit of Defendants").

[11] "Prior to the Closing Date, [Par] *shall take all necessary or appropriate actions* to ensure that neither any holder of Options and RSUs, nor any other participant in the Company Stock Plan shall, from and after the Closing, have any right thereunder to acquire any securities of [Par] or to receive any payment or benefit with respect to any award previously granted under the Company Stock Plan, except as provided in this Section 3.7 [Par] shall take all necessary actions to terminate the Company Stock Plan effective upon the Closing." Merger Agreement § 3.7 (c) (emphasis added). The Merger Agreement also provides that "any compensatory amounts payable in cash . . . for

who held equity-based compensation entitlements at the time of the Transaction and that Par did in fact make the payments. In response, the Trustee concedes that Par may have made the actual payments to the Individual Defendants, but contends that Endo nevertheless was the relevant transferor because Par's role was that of a "mere conduit" between Endo and the Individual Defendants, with Par merely facilitating the transfer without having the ability to exercise any dominion and control over the funds.[12] The Trustee's contention is that the Individual Defendants are therefore properly classified as direct or immediate transferees.

As further detailed below, however, the Trustee has not plausibly alleged that Par was a "mere conduit" in the Transaction because, among other reasons, Par was the seller of assets conveyed to Endo, not merely a facilitator or implementer of an exchange between Endo and the Individual Defendants. Moreover, for reasons that are also detailed below, the Trustee has not sufficiently pled facts supporting a plausible inference that Endo did not receive "value" for the payments that the Individual Defendants received (as contrasted by the overall consideration paid to Par) because, in exchange for those payments, the Individual Defendants surrendered accrued and unaccrued compensation and equity entitlements, an exchange that Endo specifically bargained for with Par and accepted at closing as a condition of the Merger Agreement. In fact, the governing statute explicitly instructs that "value" "include[es] satisfaction of a present or antecedent debt" – a potentially insurmountable obstacle to the Trustee's claim.

Turning in more detail to the proper categorization of transferees in constructive fraudulent conveyance actions, under § 550(a)(1) of the Bankruptcy Code, the Trustee may

___

which withholding is required shall be remitted to [Par] or applicable payroll agent for payment to the applicable Person through their regular payroll procedures, as applicable." *Id.* § 3.11.

[12] The Complaint alleged that Endo was the transferor without acknowledging that Par made the payments that the Individual Defendants received, and did not include facts to establish or support an inference that Par was a mere conduit. This contention was first raised in the Trustee's response to the Individual MTD. This decision nevertheless addresses the issue as necessary to a legally sound resolution of the motion, and as adequately presented by facts that are properly considered in deciding the motion to dismiss, including the terms of the Merger Agreement.

recover the value of an avoided transaction from initial transferees, but, in determining who was such an initial transferee, courts exclude professional intermediaries, such as banks and escrow agents, which are "mere conduits" of the transfer and do not receive any benefit therefrom. *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 55-58 (2d Cir. 1997). This approach has practical significance because the initial transferee is in effect strictly liable for the transfer, *see Finley*, 130 F.3d at 57, whereas a subsequent transferee is entitled to raise as a defense that it took "for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b); *see Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312-13 (Bankr. S.D.N.Y. 1999).

The "mere conduit" doctrine recognizes that actual counterparties to a transaction often receive the funds via conduits, but should nevertheless be functionally designated as initial transferees because "it would be inequitable to impose the strict liability reserved for an initial transferee on a conduit simply because he or she was the first to physically hold the money or property despite the fact that he or she was powerless to 'put the money to [his or her] own purposes.'" *Stratton Oakmont, Inc.*, 234 B.R. at 313 (quoting *Finley*, 130 F.3d at 57). Practically, the determination that a party is a conduit means that the first non-conduit in the chain will be deemed the initial transferee. *Feldman*, 2024 WL 4123779, at *15.

To determine whether a party is an initial transferee or mere conduit, the Second Circuit has adopted the "dominion and control" test:

> [W]e think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the "initial transferee"; the agent may be disregarded . . . . "Transferee" is not a self-defining term; it must mean something different from "possessor" or "holder" or "agent."

35

*Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 893-94 (7th Cir. 1988); *see Finley*, 130 F.3d at 57-58 (adopting the "dominion and control" test in the Second Circuit). Having dominion and control over the subject of the transfer means that the party can legally use and manipulate the money for its own purposes, such as to pay a debt or otherwise dispose of it. *Finley,* 130 F.3d at 57 (citing *Bonded,* 838 F.2d at 894); *Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Invs., Inc.),* 155 B.R. 332, 338 (Bankr. S.D.N.Y. 1993). A conduit, by contrast, is a party that merely touches the transferred funds for the limited purpose of giving it to someone else. *See e.g., Stratton Oakmont, Inc.*, 234 B.R. at 313.

Courts have consistently refused to find that parties facilitating transactions, such as banks, escrow agents, title companies, and law firms, are initial transferees because these types of parties are generally innocent conduits of funds who did not directly or substantively participate in the transaction and instead merely follow the instructions of transaction's actual parties in interest. *See, e.g., Finley,* 130 F.3d at 57 (insurance broker transferring premiums for the debtor is a mere conduit); *In re Moon*, 385 B.R. 541, 553 (Bankr. S.D.N.Y. 2008) (lawyer transferring settlement proceeds to client is a mere conduit); *In re Fabric Buys,* 33 B.R. 334, 336-37 (Bankr. S.D.N.Y. 1983) (lawyer placing debtor funds into escrow account for settlement payment is a mere conduit); *Bonded,* 838 F.2d at 893 (bank that received check with instruction to pay another party is a mere conduit); *In re Moskowitz*, 85 B.R. 8, 10-11 (E.D.N.Y. 1988) (title company transferring sale proceeds to debtor's outstanding lienholders is a mere conduit). However, courts have rejected mere conduit arguments when the alleged conduit had a commercial or debtor-creditor relationship with the transferor, even when that party could not use the funds for endeavors unrelated to the underlying transaction. *See, e.g., Feldman*, 2024 WL 4123779, at *14-18 (discussing cases); *In re Appalachian Finishing Works*, 244 B.R. 771, 775-

36

76 (Bankr. E.D. Tenn. 2000) (lessor of debtor's equipment was not a "mere conduit," even though it assigned all its rights under the contract to a bank and had thereafter received debtor's payments merely as collection agent, because the parties had a "direct business relationship" and nothing in their agreements obligated the transfer of these specific funds to the third-party banks); *Lowry v. Security Pacific Business Credit, Inc. (In re Columbia Data Products, Inc.),* 892 F.2d 26, 27-29 (4th Cir. 1989) (party who assigned its rights to receive debtor's payments to another did not become a "mere conduit" because it had a direct business relationship with the debtor and was using the funds for its own purpose in satisfying its debt to the bank even though the party did not have the discretion to use the funds for other purposes).

The facts alleged in the Complaint make clear that Par was a substantive transactional counterparty to Endo, and that the payments to the Individual Defendants were in satisfaction of Par's own obligations in two respects: first, Par's satisfaction of stock options or restricted stock units ("**RSUs**") that Par had previously granted or committed to grant to the individuals who now constitute the Individual Defendants; and second, Par's satisfaction of its contractual obligation to Endo as part of the Transaction to satisfy all outstanding option and RSU obligations or any other entitlements that could have interfered with the Transaction which contemplated Endo receiving all the equity in Par. As in *Columbia Data Products* and *Appalachian Finishing Works*, these facts, which appear on the face of the Complaint and in agreements incorporated in or integral to it, are incompatible with the contention that Par was a mere conduit of the funds that were ultimately paid to the Individual Defendants in connection with Endo's acquisition of Par. *See Columbia Data Products,* 892 F.2d at 29; *Appalachian Finishing Works*, 244 B.R. at 776. To put it in terms employed by *Iqbal* and *Twombly*, no fact alleged permits a plausible inference that Par served as a mere conduit, or that the Individual Defendants were the immediate or direct

37

transferees of the payments. In fact, the whole thrust of the Complaint is that Endo overpaid *Par*

or Par's owners for Endo's acquisition of Par; the payments to the Individual Defendants were

merely one component of that transaction that was negotiated between Endo and Par, self-

evidently for the purpose of resolving any claims of present or future ownership interests by the

Par option-holders whom the Trustee now has sued.

This conclusion is supported by the terms of the Merger Agreement that governed the

transaction. That agreement contemplated Endo's acquisition of all of the equity of Par and

charged Par with "tak[ing] all necessary or appropriate actions to ensure" and provide

"reasonable evidence" to Endo that all stock options and RSUs, whether vested or unvested,

were cancelled prior to the closing date of the Transaction. *See* Merger Agreement §§ 2.1, 3.1,

3.7(a)-(c). In the fulfillment of its obligations under the Merger Agreement, Par determined the

compensation owed pursuant to each employment agreement and equity incentive plan, withheld

appropriate taxes, paid each employee to relinquish their interests, and cancelled these

employee's options and RSUs. *Id.* §§ 3.7, 3.11.

The Trustee argues that because the Merger Agreement obligated Endo to make the

payments to the Individual Defendants,[13] Par "had no discretion over what to do with [the

funds]" and was required to make the payments because it was the only party that could cancel

its own stock. Individual Opposition at 17. But just because Par was obligated to pay the

Individual Defendants "consistent with its undertaking in respect of the challenged transaction"

does not mean that Par did not exercise its discretion over the funds, nor that the payment was

not for the primary or at least coextensive purpose and effect of satisfying Par's obligations. *Id.*

(internal citation omitted); *Columbia Data Products*, 892 F.2d at 27-29. Rather, the provision the

---

[13] "At the Closing, [Endo] shall . . . make the payments . . . required . . . by <u>Section 3.7</u>." *Id*. § 2.3(a)(v).

Trustee emphasizes gave Endo assurance that Par would satisfy its own financial obligations to parties holding option or RSU entitlements, thus insulating Endo from potential liability to those parties or disruption of Endo's acquisition of Par, but the payments remained Par's to make and served to satisfy obligations of Par, not of Endo. This conclusion follows from the agreement, its history, and the flows of money that occurred in connection with the Transaction. The Merger Agreement was negotiated jointly by Endo and Par (with related entities) and contemplated how Par was to pay its employees. *See* Merger Agreement § 10.9 ("The parties have participated jointly in the negotiation and drafting of this Agreement."). Pursuant to this contract, Endo paid Par cash, and Par then calculated and withheld taxes to satisfy its statutory and reporting obligations and made appropriate payments through its "regular payroll procedures, as applicable." *Id.* § 3.11.

Further, review of the Equity Incentive Plan ("**EIP**") that defines the obligations that Endo contractually required Par to satisfy confirms Par's discretion in the treatment of the options and RSUs issued thereunder. *See* EIP, Individual Decl., Ex. 7. In its role as "Administrator," Par had the discretion to determine "the time or times at which an Award will vest or become exercisable" and could accelerate such vesting "at any time," and to "determine the effect" on options and RSUs in the event of a merger, including to "provide for the assumption or continuation of some or all outstanding Awards or for the grant of new awards in substitution therefor by the acquiror or survivor." Individual Decl., Ex. 7 §§ 3, 6(a)(4), 7(a)(5). Par also had the discretion to determine if unvested options and RSUs should be "placed in escrow or otherwise made subject to [] restrictions." *Id.* § 7(a)(9). Thus, Par's role was not that of a mere conduit, but of a counterparty and obligor (to the Individual Defendants). Par had the discretion to determine how the stock options would be treated in the event of a merger; Par

39

merely negotiated with its buyer to receive funds to enable it to make these payments, and Par

ultimately transferred the funds in exchange for the cancellation of the Individual Defendants'

options and RSUs. *See Columbia Data Products,* 892 F.2d at 27-29; *Appalachian Finishing*

*Works*, 244 B.R. at 776.

Moreover, the Complaint's factual allegations are not comparable to those in cases where

courts have found a party to be a mere conduit. *See supra.* Par's role in the Transaction was not

that of an isolated, non-discretionary facilitator who received no benefit from the transaction

itself. *Contrast, e.g., Finley,* 130 F.3d at 57. Par had a direct business relationship with Endo

when it entered into an agreement with the company to be paid for its equity. *See e.g., Feldman*,

2024 WL 4123779, at \*14-18 (mere conduits do not have a direct business or debtor/creditor

relationship with the transferor). Even though the Merger Agreement required Par to make the

payments to the Individual Defendants and it "[could not] use the received funds for endeavors

unrelated to the underlying transaction," Par still had dominion and control over the funds

because, among other reasons, it was able to calculate the amount owed to each employee,

withhold any required amounts and transfer the funds to the appropriate location. *In re*

*Manhattan Inv. Fund. Ltd.*, 397 B.R. 1, 18 (S.D.N.Y. 2007)*. *As the Court found in *Columbia*

*Data Products* and *Cypress Restaurants of Georgia, Inc.*, Par's contractual obligation to pass on

the funds does not overcome the controlling fact that Par used the funds for its own purpose of

paying off its option and RSU holders. *See Columbia Data Products*, 892 F.2d at 29 ("The fact

that [the initial transferee] could not have used the funds for other purposes does not affect this

critical factor."); *Cypress Restaurants of Georgia, Inc.*, 332 B.R. 60, 65 (Bankr. M.D. Fla. 2005)

(finding that a staffing agency that passed funds from a business client to its own contracted

workers was not a mere conduit because in paying the workers, the staffing agency was using the

40

funds for its own purposes). At bottom, Par's use of the funds to pay its obligees in effectuating Par's contracted-for right to cancel options and RSUs under the EIP demonstrates that Par had dominion and control over the funds and should be classified as a substantive initial transferee, not a mere conduit of a payment by Endo to the Individual Defendants. *See Cypress Restaurants of Georgia*, 332 B.R. at 65 ("A party's duty to pay its own debts out of revenue does not make the party a mere conduit.").

Thus, because the facts alleged in the Complaint and in agreements incorporated therein do not plausibly support the contention that Par was a mere conduit, the Trustee has not plausibly alleged that Endo was the direct transferor to the Individual Defendants, or that the Individual Defendants were the initial transferees of Endo's payments.

This failure is fatal to the claim. Again, to state a claim for constructive fraudulent transfer against subsequent transferees, the Trustee must plausibly allege (1) the avoidability of the initial transfer, and (2) that the subsequent transferees either did not take the transfers for "value," took them in bad faith, or took them with the knowledge of the voidability of the transfers. 11 U.S.C. §§ 550(a), (b); s*ee ONH AFC CS Invs., LLC*, 2026 WL 312892, at *8-9 (a complaint that fails to plead the avoidability of the initial transfer is deficient).

First, the Complaint does not even appear to attempt to allege facts supporting the inference that any one of the Individual Defendants received the transfers in bad faith or with knowledge of their voidability. The allegations are simply that Par paid its obligees in satisfaction of their option and RSU entitlements, and there is no fact alleged that any Individual Defendant knew or had any reason to know of the transfer's voidability. The facts alleged are squarely inconsistent with any such knowledge, because the theory of voidability is that,

41

although Endo's market capitalization at the time was strongly positive, Endo's true value was negative given its accrued but not yet quantified or acknowledged opioid liabilities.

The Trustee's only possibly viable basis to state a claim against the Individual Defendants as subsequent transferees thus must be that they did not receive their transfers in exchange for "value," as articulated by section 550(b). In support of this theory, Plaintiff contends that the Individual Defendants were overpaid for whatever entitlements they held against Par because these options and RSUs were based on contingent, future events that had not occurred as of the date of the Transaction. *See* AC ¶¶ 236-40. Specifically, the Trustee acknowledges that provided "some value" but maintains that this value is not reasonably equivalent because none of the individuals' stock holdings had vested or been awarded for work already performed or and even if this were not true, the payments were determined based on Par's sale price, which is alleged to be massively inflated. Individual Opposition at 10-11.

This contention is not plausibly supported by the facts alleged in the Complaint. First, the Code instructs that "value" "includ[es] satisfaction of a present or antecedent debt," 11 U.S.C. § 550(b)(1), and the payments to the Individual Defendants may well qualify as payments on account of and in exchange for the surrender of options and RSU entitlements.

Even setting that barrier aside, the pleadings are insufficient. For each individual, Plaintiff has pled the exact cash amount received and the type of interest extinguished (common stock, option, or RSU) but has failed to plead how much Endo stock or overall makeup of consideration Endo provided to lead to that payment. *See* AC ¶¶ 39-61. The Complaint lists three equity plans with various vesting schedules that the Individual Defendants "necessarily held," but this assumption is not factually supported as the Complaint fails to assert that any single Individual Defendant held any one of those plans or that those are the only three equity plans that

42

these defendants could have held. *See id.* ¶¶ 238-40. Seven of the Individual Defendants were also paid for their Par common stock holdings, and two of these individuals were paid solely on account of common stock holdings because they did not hold Options or RSUs. *See id.* ¶¶ 41-42, 47, 52, 54, 60-61. The Complaint fails to plead the amount of Par common stock that was exchanged or how these holdings should be treated in the value analysis. The Complaint's overall failure to provide facts allowing a comparison of the value conveyed to and provided by the Individual Defendants results in a failure to state a claim because the facts alleged do not establish a lack of reasonable equivalence in consideration. *See In re Trinsum Grp., Inc.*, 460 B.R. at 393 (". . . there are no facts in the pleading regarding how much the stock was worth at the time the transfers took place or how many shares of stock were transferred with respect to each promissory note. Without this information, it is impossible for the Court to reasonably infer whether the transfer was for less than reasonably equivalent value."). As an illustrative example, defendant Terrance Coughlin received some amount of allegedly worthless Endo stock and $11,723,523 in cash in exchange for allegedly overvalued Par common stock, which the Complaint alleges accounted for $4,979,390 of the payment he received, and along with his unvested or vested "stock options and RSUs" which the Complaint alleges accounts for the other $6,744,133 of the payment. *See* AC ¶ 41. Accepting the Plaintiff's pleading as true, the Court must compare worthless Endo stock and $11,723,523 to some amount of allegedly overvalued (by at least 50%) Par common stock, options, and RSUs. The Court is unable to plausibly infer that these two consideration packages are not reasonably equivalent.

Even assuming the truth of the allegation that the payments were based on a massively inflated value for Par and that the consideration was pled sufficiently for evaluation, the Complaint does not give rise to a plausible inference that Endo did not receive any "value" from

43

the Individual Defendants and perhaps even that Endo did not receive reasonably equivalent "value" in exchange for the payments those individuals received.

By way of overview, the facts alleged in the Complaint and in the controlling agreements establish that Par was not a "mere conduit" of a payment from Endo to the Individual Defendants; that the Individual Defendants were instead "subsequent transferees" of Endo's payment; and that no facts alleged support a plausible inference of bad faith, knowledge by any Individual Defendant of the voidability of any transfer, or that any Individual Defendant failed to provide "value" (in the words of section 550(b)(1)) in exchange for their surrender of entitlements they had as against Par at the time of the Transaction. Accordingly, the Trustee has failed to state a claim for constructive fraudulent conveyance against the Individual Defendants, and Count I is dismissed with prejudice as against those defendants.

### B. Contribution

Count II of the Complaint seeks contribution from the various Defendants for their share of Endo's opioid-related liability. All Defendants seek dismissal of the contribution claim.

"Contribution is the proportionate sharing of liability among tortfeasors." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 204, 207 (2d Cir. 1987) (internal citation omitted). The right to contribution is triggered when it is appropriate for liability to be apportioned between two or more wrongdoers for harm done to a third-party. *See In re Adelphia Commc'ns Corp.*, 322 B.R. 509, 525-26 (Bankr. S.D.N.Y. 2005) (citing *Frazer Exton Dev., LP v. Kemper Envtl. Ltd.,* 2004 WL 1752580 at *13 (S.D.N.Y. July 29, 2004)). The Complaint articulates two theories of liability: (1) Defendants are jointly liable with Endo for Defendants' own conduct during the time that TPG owned Par, and (2) the TPG Transfer Defendants are joint tortfeasors with Endo as Par's alter ego. *See* AC ¶¶ 253, 299.

44

The Complaint's central allegation of misconduct is that Par had a deficient and legally noncompliant opioid suspicious order monitoring ("**SOM**") system. *See id.* ¶¶ 196-214. SOM systems are designed to detect and report suspicious orders to the Drug Enforcement Agency in furtherance of the government's efforts to combat the harm caused by opioid abuse. *Id.* When it owned Par, TPG allegedly failed to take measures to prevent or cure the harms caused by Par's deficient system, and failed to disclose the deficiencies of Par's system to Endo. *Id.* ¶ 244. Specifically, the Complaint alleges the failure by the TPG Defendants and the Individual Defendants (through breaches of their "oversight duties") "to implement an adequate SOM reporting regime at Par, failure to cure prior reporting deficiencies at Par, participation in misstatements concerning the harms of opioids, and failure to disclose these issues prior to the sale to Endo." *Id.* ¶ 253.

The Complaint alleges that Par's SOM system deficiencies allowed its opioid liabilities to soar and added significantly to Endo's liability after it acquired Par. *Id.* ¶¶ 241-255. Prior to its bankruptcy filing, Endo was the subject of "subpoenas, investigations, and more than 3,500 lawsuits arising from or related to the Debtors' substantial opioid liability," and, as a result, Endo incurred substantial legal fees and costs defending these suits and paid hundreds of millions of dollars in opioid-related settlements. *Id.* ¶ 298. The Trustee seeks contribution for: (a) "settlements paid by one or more Debtors in connection with, or as a result of, opioid-related claims;" (b) "payments of indemnity and defense costs made by one or more of the Debtors in connection with, or as a result of, opioid-related subpoenas, investigations, litigation, judgments, and fines;" and (c) "payments made by one or more of the Debtors to satisfy (i) all professional fees and costs, allowed administrative expenses, quarterly fees, and other costs related to the Bankruptcy Case and (ii) obligations under the Plan, in an amount to be determined at trial." *Id.* ¶

45

304. Under the Trustee's theories, the Individual Defendants are jointly liable in contribution with Endo as a direct result of their own tortious conduct, and the TPG Transfer Defendants are jointly and severally liable in contribution for Endo's liabilities *both* because of each one's own tortious conduct and because of their conduct as the alter ego of Par prior to the Transaction. *Id.* ¶ 256.

> 1. The Complaint Fails to State a Claim for Contribution for Joint Liability Against the Individual Defendants and the TPG Transfer Defendants

Turning first to the claim for contribution based on the theory that all defendants are jointly liable with Endo, both Defendant motions argue that the Trustee has failed to plead any facts demonstrating or leading to a plausible inference that any one of the Defendants had any role or bore any responsibility for Par's allegedly deficient SOM system or alleged misstatements. *See* TPG MTD at 53; Individual MTD at 15-16. The Court agrees.

Contribution is a right of action that functions as a procedural device to equitably distribute responsibility for plaintiff's losses proportionally among those responsible for the losses, *i.e.*, among joint tortfeasors. *See Chemung Canal Tr. Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 16 (2d Cir. 1991). To plead a contribution claim, it is necessary to assert that the defendant participated in the tort itself through satisfaction of the elements of the alleged tort – the applicable duty, breach, causation, and damages. *Cf. Ainette v. Mkt. Basket, Inc.*, No. 19cv04506, 2021 WL 1022590, at *11 (S.D.N.Y. Mar. 16, 2021) (dismissing contribution claims because "[a]n action over contribution will not lie unless all of the essential elements of a cause of action against the proposed contributor can be made out," and the complaint only contained conclusory statements without sufficient facts) (internal citation omitted). While Rule 8 notice pleading does not require particularity, the facts in the complaint must allow the Court to plausibly infer that the requirements of a claim have been alleged, and group pleading or

46

conclusory allegations do not meet this standard. *See* Fed. R. Civ. P. 8; *see id.*; *see also Bellis v. Tokio Marine & Fire Ins. Co.*, No. 93 CIV. 6549 (DAB), 2002 WL 193149, at *17 (S.D.N.Y. Feb. 7, 2002) (a contribution claim requires that "all of the essential elements of a cause of action against the proposed contributor can be made out"); *Genworth Fin., Inc. Consol. Derivative Litig.*, No. CV 11901-VCS, 2021 WL 4452338, at *22 (Del. Ch. Sept. 29, 2021) (same).

Starting with the Individual Defendants, the Complaint lists each one of their respective positions at Par and the approximate dollar value of the stock option and RSU holdings for which they were compensated in the Transaction. AC ¶¶ 39-61. The Complaint states that five individuals were nominated to serve on the Par board by TPG, three of which were officers and directors of TPG and one of which was a senior advisor. *Id.* ¶ 265. The remaining allegations in the Complaint concern the conduct of Par as an entity. The Trustee seeks contribution under the "applicable law" that governs each of Endo's various opioid liability settlement agreements for which contribution is sought, with the Trustee explaining that determining which law applies is "a highly fact-intensive inquiry" because the agreements contemplate application of the laws of many different jurisdictions and the claims involve parties and conduct across the nation. *Id.* ¶ 302. The Complaint further requests contribution "as a matter of equity and good conscience," *id.*, but, in opposition to the Individual MTD, the Trustee characterizes his claim as being for "breaches of obligations imposed by state tort law, such as the obligation not to commit fraud or breach fiduciary duties." Individual Opposition at 18-19.

The Individual Defendants seek dismissal on multiple grounds, including (1) a lack of factual allegations explaining how or even whether any particular Individual Defendant contributed to Par's conduct in a way that gave rise to Endo's settlement and other costs; and (2) a failure to identify any breach of any specific common or other law giving rise to the

47

contribution claim. *See* Individual MTD at 15-16. In response, the Trustee argues that he has pled more than sufficient "allegations concerning specific misconduct by the Individual Defendants that contributed to Endo's liability in those cases, including allegations that the Individual Defendants breached their oversight duties, failed to implement safeguards or ensure adequate compliance procedures, and overlooked suspicious activity and red flags." Individual Opposition at 20.

The Court agrees with the Individual Defendants' contentions. The Complaint is devoid of allegations of fact that support a plausible inference that any particular Individual Defendant engaged in conduct that rendered that person jointly liable with Endo, as is necessary to support a claim for contribution. First, the Trustee does not plead any facts that are specific to the conduct of any one of the Individual Defendants, instead impermissibly engaging in "group pleading." *Genworth Fin., Inc.*, 2021 WL 4452338, at *22; *see Bellis*, 2002 WL 193149, at *17. The Complaint does not include even a single conduct-related allegation against any particular Defendant that could lead to an inference that they had any personal part in the commission of the tort for which contribution is sought. *See Bellis*, 2002 WL 193149, at *17. Further, the Complaint does not specify or parse out whether the opioid settlements that Endo eventually reached arose from conduct or harm that occurred before the Transaction (after which no Individual Defendant could possibly be liable for contribution), what any specific Individual Defendant did to contribute to the liability extinguished by Endo's settlements, nor even what state's law or type of law gives rise to the Individual Defendants' asserted liability. Despite having access to Endo and Par's records and having amended the complaint once already after seeing a prior motion to dismiss, Plaintiff has failed to identify a single fact identifying who was responsible for oversight, what those duties entailed, how any Individual Defendant allegedly

48

breached those duties, when any supposed breach occurred, or even whether they knew or could have known about the issues with the SOM. The Complaint thus rests on many unsupported and therefore implausible inferences. *See Horman v. Abney*, No. CV 12290-VCS, 2017 WL 242571, at *12 (Del. Ch. Jan. 19, 2017) (on an even more developed factual record, dismissing contribution claim against directors and officers for failure to plead specific facts related to the individuals and their oversight duties).

Second, the Trustee even fails to plead the predicate tort for which he is seeking contribution, let alone that supposed tort's legal elements or factual support to make out a claim. To support a claim for contribution, the plaintiff must demonstrate a claim for which contribution can be sought, which necessitates, at the very least, identifying a type of law and the basic legal elements supporting the existence of a viable claim for the underlying tort. *See Bellis*, 2002 WL 193149, at *17; *Genworth*, 2021 WL 4452338, at *22; *cf. Perkins Eastman Architects, P.C. v. Thor Eng'rs, P.A.*, 769 F. Supp. 2d 322, 326 (S.D.N.Y. 2011) ("Rather, it is well settled that 'the existence of some sort of tort liability is a prerequisite to application of the [contribution] statute.'") (internal citations omitted). Merely stating that contribution is sought for "breaches of obligations imposed by state tort law, such as the obligation not to commit fraud or breach fiduciary duties" is conclusory and insufficient. *See* Individual Opposition at 18-19. In this respect, the Complaint is similar to the complaint that was held insufficient in *Genworth*:

> Beyond using the definition to describe an individual, the Complaint makes no further mention of "Executive Defendant(s)." Indeed, there are no specific allegations directed against the Officers and there are no separate claims asserted against them either. A plaintiff must adequately plead a breach of fiduciary duty claim against each individual director or officer; so-called "group pleading" will not suffice. Plaintiffs have resorted to group pleading throughout their Complaint. . . . Since the Officers are named as defendants, they are entitled to a clear finding that the claims against them, if there are any, are likewise dismissed under [] Rule 12(b)(6).

49

2021 WL 4452338, at *22 (internal citation omitted); *Bellis*, 2002 WL 193149, at *17 (also holding that failure to plead the action against each specific defendant is fatal to the contribution claim). Similarly, Plaintiff neglected to plead any theory of breach of fiduciary duty that would give rise to the Individual Defendants' liability, instead pleading in broad-brush and conclusory fashion that all the Individual Defendants "failed to implement adequate reporting systems" and "breached their oversight duties." AC ¶ 299. These generalized complaints do not identify any particular breach by any particular defendant of any particular duty of that person. *See Bellis*, 2002 WL 193149, at *17. This generalized criticism is insufficient to state a claim that any particular defendant actionably participated in breaches of fiduciary duty for failure to prevent, take measures to stop, or disclose the defective SOM system. *Compare id., with* Individual Opposition at 20 (citing *Fletcher v. Dakota, Inc.*, 99 A.D.3d 43, 47 (1st Dep't 2012) ("[T]he participation of an individual director in a corporation's tort is sufficient to give rise to individual liability.")).

The main case relied upon by Plaintiff does not save the contribution claim and, if anything, supports the Defendants' motions. In that case, the defendants contended that the complaint was procedurally defective, arguing that a final judgment was a prerequisite to a claim for contribution. *See In re Today's Destiny, Inc.*, 388 B.R. 737, 757-59 (Bankr. S.D. Tex. 2008). The court disagreed, concluding that a final judgment was not required, reasoning that the assertion of a claim in the bankruptcy case was sufficient to allege a valid cause of action for which contribution can be sought, but also observing that "neither contribution nor indemnification can be recovered from a party against whom the injured party has no cause of action." *Id.* at 759. Here, Plaintiff has not adequately pled the underlying state law cause of action as against the Individual Defendants, and so even *Today's Destiny* supports dismissal

because Endo assertedly has not identified any "cause of action" that any "injured party" has against the Individual Defendants. The Trustee's remaining case law does not save his pleading. *See* Individual Reply at 14 n.15 (distinguishing Plaintiff's cited case law).

As the Trustee has not stated a claim for contribution against the Individual Defendants, whether for the tort of breach of fiduciary duty or otherwise, the contribution claim against the Individual Defendants is dismissed. *See Bellis*, 2002 WL 193149, at *19 (dismissing contribution claims where there were "no facts alleged that demonstrate [that defendant] committed any tort for which contribution may be sought"); *Ainette*, 2021 WL 1022590, at *11 (dismissing contribution claims because the complaint solely contained conclusory statements that failed to show all the elements of a cause of action for which contribution is sought).

Turning to the TPG Defendants, the Complaint does not plead facts that support a plausible inference that the TPG Defendants bore responsibility for Par's alleged deficient SOM system or alleged misstatements. The Complaint explains that TPG "operates through various investment advisors, general partners, fund vehicles, fund managers, and special purpose vehicles." AC ¶ 257. Par was a portfolio company within Defendant TPG Partners VI, L.P. and the shares of Par were held through Defendants TPG Sky L.P., TPG Sky Co-Invest, L.P., and TPG Biotechnology Partners IV, L.P. *Id.* at 258-59. The other TPG Defendants served as investment advisors, managers, or general partners of the other entities. *Id.*

Akin to the allegations against the Individual Defendants, the Trustee argues that the TPG Defendants failed to prevent, cure, or disclose the allegedly defective SOM system and misstatements regarding opioids during the time it owned Par. *Id.* ¶¶ 241-255. In support of its theory for liability through participation, the Trustee contends that TPG was aware of the issues facing Par by way of its "control of the company board, active role in managing the company,

51

and its extensive information rights," *id.* ¶ 214, and generally aware of Par's reporting and other legal obligations and the enormous enterprise risk posed by opioid liability. *Id.* ¶¶ 202-14. However, the Complaint fails to identify a single discrete instance of conduct by any of the various TPG entities. Instead, the Complaint relies on the fact that certain TPG affiliates owned and managed Par, from which the Complaint proposes imputing Par's liability to all TPG Defendants. Yet, the Complaint has not provided a single factual allegation against TPG other than general allegations that the TPG entities were aware of the issues. This leaves the Court unable to draw any plausible inference that TPG was a direct, joint tortfeasor with Endo. *See Bellis,* 2002 WL 193149, at *19 (S.D.N.Y. Feb. 7, 2002); *Ainette*, 2021 WL 1022590, at *11; *Genworth Fin., Inc.*, 2021 WL 4452338, at *22. Thus, the trustee has failed to state a claim for contribution against the TPG Defendants on the theory of direct joint liability, and the contribution claim on that basis is dismissed.

> 2. The Complaint Also Fails to State a Contribution Claim Against the TPG Transfer Defendants as Par's Alter Ego

The Trustee's second theory of contribution liability is that the TPG Defendants exerted such control over Par's operations that the TPG entities were "alter egos" of Par and should be held liable for Par's conduct prior to the Transaction. As further detailed below, the Complaint fails as a matter of law to reach the high bar required to show that the TPG Defendants were Par's alter egos, and the Trustee has accordingly failed to state a claim for contribution on that basis.

In general, one corporate entity is not liable for the acts of another entity. *See In re BH S & B Holdings LLC*, 420 B.R. 112, 133 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent

52

corporation . . . is not liable for the acts of its subsidiaries.") (internal quotation omitted). However, courts can pierce the veil of a corporation "where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its owner." *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir. 1995).

"Under New York choice-of-law principles, the issue of whether the corporate veil may be pierced is determined under the law of the state of incorporation." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 85 n.10 (S.D.N.Y. 2010) (citing *Fletcher*, 68 F.3d at 1456). Here, the TPG Transfer Defendants are various types of entities incorporated or otherwise created under the laws of Delaware, so Delaware law applies. *See* AC ¶ 23-38. Additionally, when pleading multiple entities as alter egos, it is "necessary to pierce the corporate veil at each 'level or layer' of ownership." *See, e.g., Soroof Trading Dev. Co. v. GE Microgen, Inc.,* 283 F.R.D. 142, 151 n.9 (S.D.N.Y. 2012). This means that stating a claim based on alter ego requires that the two-pronged test be applied and satisfied at each level or layer of ownership applicable within the multi-faceted entity structure. *In re Heritage Org., L.L.C.*, 413 B.R. 438, 516 (Bankr. N.D. Tex. 2009) (plaintiff "was required to satisfy the Delaware two-pronged test at each level or layer of ownership").

Piercing the corporate veil is a difficult task that under Delaware law "may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it . . . ." *BH S & B Holdings LLC*, 420 B.R. at 133 (quoting *Pauley Petroleum Inc. v. Continental Oil Co.,* 239 A.2d 629, 633 (Del. 1968)); *see Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task.") (internal quotation omitted). Delaware law permits a court to

53

pierce the corporate veil where the entity "is in fact a mere instrumentality or alter ego of its owner." *NetJets Aviation, Inc. v. LHC Communc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (interna quotition omitted). To establish "alter ego" liability, Delaware law applies a two-pronged test: (1) whether the entities in question operated as single economic entity; and (2) whether there was an overall element of injustice or unfairness. *In re Sunbeam Corp.*, 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002) (applying Delaware law) (citing *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995)). A plaintiff need not prove actual fraud to establish alter ego liability but must demonstrate "a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness." *NetJets Aviation, Inc.*, 537 F.3d at 176 (internal quotation omitted).

In considering the single economic enterprise prong, Delaware courts consider various factors: (1) whether the company was solvent; (2) whether the company was adequately capitalized for the undertaking; (3) whether corporate formalities were observed; (4) whether, in general, the company simply functioned as a façade for the dominant shareholder; and (5) whether the dominant shareholder siphoned company funds. *Fletcher*, 68 F.3d at 1458. No single factor is dispositive, but some combination of factors is required. *BH S & B Holdings LLC*, 420 B.R. at 134. At the pleading stage, mere conclusory assertions of control are insufficient to sustain an alter ego claim; rather, a plaintiff must demonstrate complete control. *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1144-45 (S.D.N.Y. 1996) (internal citations omitted). The asserted dominion and control must be so extensive that the controlled company is precluded from having "legal or independent significance of its own. There must be an abuse of the corporate form to effect a fraud or an injustice—some sort of elaborate shell game." *In re Sunbeam Corp.*, 284 B.R. 355, 365 (quoting *Outokumpu Eng'g. Enters., Inc. v. Kvaerner*

*Enviropower, Inc.,* 685 A.2d 724, 729 (Sup. Ct. Del. 1996)). "To survive a motion to dismiss, a plaintiff must allege facts showing that the controlling owners operated the company as an 'incorporated pocketbook' and used the corporate form to shield themselves from liability." *In re Ticketplanet.com*, 313 B.R. 46, 70 (Bankr. S.D.N.Y. 2004) (internal quotation omitted). As *Wallace* put it, the plaintiff must plead facts showing that the "corporation [is] a sham and exist[s] for no other purpose than as a vehicle for fraud." *Wallace v. Wood,* 752 A.2d 1175, 1184 (1999). "The fraud or similar injustice . . . must, in particular, be found in the defendant's use of the corporate form." *Id.*

Meanwhile, for the second prong involving fraud or injustice, the plaintiff must allege facts to allow the Court plausibly to infer that the corporate structure itself was used to further the fraud or injustice or as a shield for unjust acts, and the fraud or injustice must amount to more than Plaintiffs' underlying claims. *See Partner Reinsurance Co. Ltd. V. RPM Mortgage, Inc.*, 604 F. Supp. 3d 121, 207-09 (S.D.N.Y. 2022) (quotations omitted); *see also Nat'l Gear & Piston*, 975 F. Supp. 2d at 406 (collecting cases).

The Trustee makes two broad allegations that TPG and Par operated as a single economic entity. First, the Complaint alleges that following TPG's purchase of Par in 2012, the TPG Defendants took steps to dominate and control Par's operations. Citing public securities filings, the Trustee alleges that Defendant TPG Partners VI, L.P. was Par's "ultimate parent entity" and that Par acknowledged TPG's control and "substantial influence" over Par. AC ¶ 263. The Trustee maintains that Par lacked independence because TPG directors held a majority of Par board seats and because of the various control agreements that "solidified TPG's control over the management and operations of Par" and its ability to influence the company's day-to-day operations. *See id.* ¶¶ 266; 264-76. Second, the Complaint alleges that the TPG Defendants

55

treated Par's assets as their own. Once it became apparent that Par faced substantial and inevitable opioid-related liabilities, the Complaint alleges that TPG caused Par to transfer approximately $493 million for the benefit of the TPG Defendants and related insiders. *See id.* ¶¶ 277-80. The Trustee alleges that Par was already in poor financial condition, and that TPG compelled Par to fund this distribution by incurring new debt. *Id.* ¶ 281. The Trustee also notes that TPG charged Par an ongoing management fee throughout its ownership. *Id.* ¶ 274. Further, the Trustee contends that it is sufficient to allege siphoning of funds to satisfy the "element of injustice or unfairness" prong, and that such siphoning is alleged in the form of the dividend and its accompanying debt, management fees, and the failure to cure the issues related to the allegedly deficient SOM system. TPG Opposition at 52.

In support of their motion, the TPG Defendants generally argue that the Complaint is devoid of allegations of complete "domination and control" that would preclude Par from having its own legal significance. *See* TPG MTD at 46-51. Defendants point to facts reflecting that TPG and Par were distinct corporate entities with different principal locations and operations in different industries. *See id*. The TPG Defendants maintain that the Trustee's alleged facts describe typical features of a private equity company's ownership of a portfolio company and are insufficient alone, as a matter of law, to impose alter ego liability on the TPG entities. *See id*. Regarding the second prong, the TPG Defendants argue that the Trustee has failed to plead that any inequity resulted from the use of the corporate form and the Trustee's exclusive reliance on the dividend as a "siphoning of funds" is not enough to allege "something like fraud," which is required to show injustice. TPG Reply at 18.

56

Starting with the first prong, the Trustee has failed to plead facts that support a plausible inference that Par and TPG operated as a single enterprise.[14] Examining the requisite factors, the Trustee's argument essentially claims that factors 3 (lack of corporate formalities), 4 (company as façade), and 5 (siphoning funds) are present, assertedly signifying the existence of an alter ego relationship. *See Fletcher*, 68 F.3d at 1458. Having reviewed these factors in the context of the facts alleged in the Complaint, the Court disagrees.

First, factor 3 is not supported by facts showing a lack of adherence to corporate formalities; the Trustee unpersuasively points to TPG's use of an abbreviation to reference a multitude of affiliated TPG entities in its public securities filings but that falls short of facts showing that corporate formalities were ignored. *See* AC ¶ 263. The Complaint otherwise provides nothing but conclusory statements that TPG and Par disregarded corporate formalities without including a single factual allegation in support. Moreover, Par's status as a "controlled company" does not control the alter ego analysis because mere ownership of a subsidiary or portfolio company does not establish a failure to follow corporate formalities as required. *Cf. In re Maxus Energy Corp.*, 641 B.R. 467, 501 n.71 (Bankr. D. Del. 2022) (citing cases rejecting alter-ego claims that are based on definitions from administrative regulations and other laws rather than traditional veil-piercing factors).

Factor 4 – whether, in general, the company simply functioned as a façade for the dominant shareholder – is also not supported by the facts alleged in the Complaint. While the Complaint shows that TPG had control and "substantial influence over" Par because of its status

---

[14] To succeed on the alter ego claim, the Trustee must plausibly allege facts that allow the corporate veil to be pierced at each layer of ownership, meaning alleging that (1) all the TPG Defendants operated as a single enterprise, and (2) the TPG Defendants operated with Par as a single economic enterprise. *See Heritage Org., L.L.C.*, 413 B.R. at 516. Because the Trustee failed to allege that Par and TPG were a single enterprise, this Court need not separately examine whether each of the various TPG entities were alter egos.

as the company's private equity owner, that level of control does not amount to Par having no corporate identity. The Complaint does not plead facts showing that TPG and Par commingled funds or failed to maintain corporate records, nor that Par did not have its own employees, earn its own revenue, hold its own bank accounts, or pay its own taxes or insurance. In fact, the Complaint's factual allegations – Par's board's lack of independence from TPG, Par's entry into various control agreement with TPG, the management fees TPG was able to extract from Par before the sale to Endo, and TPG involvement in all aspects of Par's business, including corporate governance, operations, acquisitions strategy, and financial performance measurement – all feature in decisions involving private equity ownership arrangements and have not been held to raise inferences of abuse of the corporate form. *See* AC ¶¶ 264-76; *see also In re Broadstripe, LLC*, 444 B.R. 51, 103 (Bankr. D. Del. 2010) (rejecting alter-ego theory based on private equity firm's board membership and "influence over . . . operations and dealings"); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 789 (Bankr. W.D. La. 2013) (rejecting alter-ego liability where private equity firm and portfolio company were "two distinct businesses"); *BH S & B Holdings LLC*, 420 B.R. at 138 (Bankr. S.D.N.Y. 2009) ("It is well-established that wholly-owned subsidiaries may share officers, directors and employees with their parent, without requiring the court to infer that the subsidiary is a mere instrumentality for the parent . . . [the owner entity's] retained decision-making authority is also insufficient to pierce the corporate veil.").

In fact, the Complaint's allegations show that TPG and Par operated as two discrete businesses: the TPG Defendants are (or were) affiliated entities comprising a Texas-based private equity firm whereas Par is or was a New Jersey-based pharmaceutical company that distributed, marketed, and sold generic pharmaceutical products. *See* AC ¶¶ 257, 23-25. The fact

58

that Par was an operational company for 30 years before the Transaction further undermines the argument that it was "merely a façade" for the operations of TPG. *See e.g., Gulf Fleet Holdings, Inc.*, 491 B.R. at 789 (that business operated for 8 years before a private equity firm purchased it "tends to undercut a finding" that the company was "merely a facade for the operations of" the private equity firm); *In re Moll Indus., Inc.*, 454 B.R. 574, 589 (Bankr. D. Del. 2011) (the two companies' having "conducted fundamentally different businesses" was "fatal to any argument that *Moll* was a mere facade" for the other entity); *In re Foxmeyer,* 290 B.R. at 244; *Broadstripe, LLC,* 444 B.R. at 103-104. In *Broadstripe*, for example, the bankruptcy court concluded that the debtor and the private equity firm operated two distinct types of businesses with different headquarters, employees, and administrative operations, and that allegations that employees from the private equity firm served on the debtor's board and were using their roles to benefit the private equity firm did not "create triable issues of fact" that the two operated as a single economic entity. *Broadstripe,* 444 B.R. at 103-104. Here, too, the allegations show two distinct businesses that share some overlapping personnel, but that is insufficient to plausibly allege an alter ego relationship.

As to the fifth factor, the Trustee alleges that TPG caused Par to pay a roughly $493 million dividend to the Par shareholders (including TPG and its insiders), which the Trustee characterizes as "siphon[ing]" of Par's corporate funds. *Fletcher*, 68 F.3d at 1458; *see* AC ¶¶ 280-81. The Complaint further alleges that Par took on debt to pay for this dividend, leaving Par with insufficient capital. *Id.* ¶ 280-81. The fifth factor might well support a plausible alter ego claim if it were accompanied by other indices, but here it is not accompanied by such facts, and the mere payment of a dividend as a "siphoning of funds" does not support a further inference that there was a mingling of corporate assets such that the dividend was improper or caused

59

injustice. *See BH S & B Holdings LLC*, 420 B.R. at 134 (combination of factors is required); *see also Gulf Fleet Holdings, Inc.*, 491 B.R. at 790 (reliance on allegations concerning dividend does not meet burden of establishing "something like fraud") (internal quotation omitted). Thus, the Trustee has not met his burden of plausibly alleging that TPG and Par operated as a single enterprise as "[n]o single factor can justify a decision to disregard the corporate entity . . . some combination of them is required." *Blockchain Mining Supply & Servs., LTD.*, 2022 WL 3155267, at *3.

Turning to the second alter ego prong, the Trustee contends that "allegations of siphoning funds sufficiently pled the injustice prong." TPG Opposition at 52 (citing *Blockchain*, 2022 WL 3155267, at *4). However, the allegations in *Blockchain* were much more egregious than the facts alleged here. In *Blockchain*, the company had allegedly been insolvent for years, yet a parent pulled out funds from an obviously failing enterprise. *See Blockchain*, 2022 WL 3155267, at *3-4 (alleging subsidiary "was not adequately capitalized" because its debts outweighed its assets and it had never been solvent during its three-year existence). And here, unlike *Blockchain*, the Trustee fails to plead facts showing that any "fraud or inequity" arose from the TPG Defendants' "use of the corporate form." *Soroof*, 283 F.R.D. at 151 (internal quotation omitted). Allegations that certain TPG Defendants received a dividend from Par do not alone carry the Trustee's burden to plead that Legacy Par "effectively . . . exist[ed] as a sham or shell through which the [TPG Transfer Defendants] perpetrate[d] injustice." *Nat'l Gear*, 975 F. Supp. 2d at 406; *Ticketplanet.com*, 313 B.R. at 70 ("To survive a motion to dismiss, a plaintiff must allege facts that the controlling owners operated the company as an 'incorporated pocketbook.'"). This is especially true because, given Par's evident market value at the time, there has been no plausible factual allegation that the dividend payment defrauded or victimized

60

known creditors of Par, Endo or anyone else. Courts have granted motions to dismiss as well as motions for summary judgment in favor of defendant parent companies where there has been a lack of sufficient evidence to place the alter ego issue in dispute. *See e.g., Fletcher*, 68 F.3d at 1458-59 (collecting cases where alter ego theories were rejected on insufficient evidence on motions to dismiss or for summary judgment). Meanwhile, the Trustee cites no analogous case law counseling this Court to sustain the alter ego claim in this case, *see* TPG Opposition at 49-51, and courts have dismissed cases with far more serious and detailed factual allegations than the Trustee alleges here. *See, e.g., Moll Indus., Inc.*, 454 B.R. at 589. The Complaint's alter ego claim here cannot survive Defendants' motions.

To summarize, the Complaint does not plausibly allege that the TPG Defendants were the alter egos of Par, and so the Complaint has not stated a claim for contribution on that basis. For this reason and because the Complaint also fails to state a claim for contribution based on a theory of joint liability, the Complaint's claim for contribution is dismissed against the Defendants.

## VI. CONCLUSION

For the reasons stated above, the Court: (i) GRANTS the TPG MTD with respect to the contribution claim asserted against the TPG Defendants; (ii) DENIES the TPG MTD with respect to the constructive fraudulent transfer claim pled against the TPG Transfer Defendants; and (iii) GRANTS the Individual MTD and dismisses both claims pled against the Individual Defendants. Because the Trustee has already amended his complaint after seeing motions to dismiss his initial complaint, and because allowing yet a further round of amended pleadings would unfairly prejudice defendants and unjustifiably burden the courts, this decision's dismissals of claims are with prejudice. This decision and order is self-effectuating and no

61

further order is required to give formal effect to this ruling. The parties are to confer and jointly

contact chambers to schedule a case management conference to occur no later than 30 days after

entry of this decision and order.

IT IS SO ORDERED.

Dated: New York, New York
        May 29, 2026

                                          _s/ David S. Jones_____
                                          Honorable David S. Jones
                                          United States Bankruptcy Judge